RUPE INVESTMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56181. Filed May 12, 1958.

*Robert F. Ritchie, Esq.*, for the petitioner.
*Douglas M. Moore, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year ended June 30, 1950, in the amount of $29,979.32.

The basic question presented is whether, as contended by the petitioner, it was the owner of certain stock and dividends paid with re-

spect thereto, and therefore entitled to a dividends-received credit, and to an ordinary loss upon the later sale of the stock, or whether, as determined by the respondent, the petitioner merely held legal title for the benefit of another corporation and derived ordinary income for brokerage services in acquiring the stock for such other corporation.

### FINDINGS OF FACT.

Most of the facts are stipulated and the stipulations, including exhibits, are incorporated herein by this reference.

The petitioner is a Texas corporation having its principal office in Dallas, Texas. It filed its corporate income tax return and personal holding company tax return for the fiscal year ended June 30, 1950, with the collector of internal revenue at Dallas, Texas. Its name at that time was Dallas Rupe & Son. It was engaged in business as a securities dealer and investment banker and is the successor to a partnership which, prior to July 1, 1940, had engaged in the same business.

During the years 1949 and 1950 D. Gordon Rupe and his mother owned the controlling interest in the petitioner. The mother was inactive and Rupe exercised control of the corporation as its president.

The petitioner has from time to time owned or controlled various hotel companies owning hotels in Kansas, Oklahoma, Arkansas, Texas, and Indiana.

Baker Hotel of Dallas Inc. (hereinafter referred to as Baker Inc.), is a Texas corporation which owned the Baker Hotel, a 17-story building with 650 rooms, one of the leading hotels of Dallas, Texas. Rupe became a director of Baker Inc. at the culmination of a reorganization of that corporation in 1936 and served in such capacity continuously thereafter, including all times material to this case.

During the years 1940 through 1944, the petitioner acquired 250 shares of the common stock of Baker Inc. at a cost of $1,440. It held such shares in its investment securities account thereafter.

In 1949 and 1950 the issued and outstanding stock of Baker Inc. consisted of 113,000 shares of no-par-value common stock and 13,205 shares of $10 preferred stock. During the early part of 1949 the affairs of Baker Inc. were directed by Fenton J. Baker, who with his wife owned slightly more than 50 per cent of the common stock and was its president, one of its directors, and general manager of the Baker Hotel. A 35 per cent stock interest, amounting to 39,550 shares, was held by the National Bank of Commerce, as trustee for a protective committee for prior bondholders of a predecessor corporation. The protective committee exercised all rights in this stock for the beneficial interest of participants to whom participating certificates had been issued.

In the spring of 1949 Rupe learned at a meeting of the board of directors of Baker Inc. that certain interests had approached P. J. Dee, who was a director of Baker Inc. and a member of the protective committee holding the 35 per cent stock interest, with a view to purchasing such stock. Dee stated that he believed that he could obtain a price of $25 per share, but that he also believed that any such transaction would necessarily require gaining control of the corporation.

Rupe then talked with Baker with regard to the possibility of Baker's selling his 50 per cent stock interest in Baker Inc. On several occasions the matter was discussed and Baker indicated that he would be willing to sell his stock at approximately $35 per share.

Thereafter in the spring of 1949 the petitioner secured informal commitments from Baker and some of his close associates, who altogether owned approximately 56 per cent of the Baker Inc. stock, to sell their stock for $30 to $35 per share. The previous market price had been much lower.

Rupe asked W. L. Moody, Jr., a wealthy individual living in Galveston, Texas, whether he or any of his enterprises were interested in acquiring control of Baker Inc. Moody had several major interests and was president and controlling stockholder of a number of corporations. The Moody enterprises included the National Hotel Company, Texas National Hotel Company (hereinafter referred to as Texas National), American National Insurance Company, and W. L. Moody & Company, Bankers, which was an unincorporated banking firm (hereinafter referred to as Moody Bank).

Moody, speaking for Texas National, expressed an interest in purchasing the physical properties of Baker Inc., but stated that it would not be interested in purchasing Baker Inc. stock because the then existing financial structure of such corporation included an undistributed earned surplus of approximately $1,500,000. He stated, however, that Texas National would be interested in purchasing such stock if it could acquire not less than 85 per cent of the common stock at an outlay not to exceed $2,500,000.

At that time the property of Baker Inc. was encumbered by a first mortgage loan from the Equitable Life Assurance Society of the United States in the amount of approximately $1,500,000. Moody stated that American National Insurance Company would be interested in carrying the first mortgage loan on the Baker Hotel.

In June 1949, the petitioner submitted a proposal to Moody to conform to Moody's requirements. Such proposal was set forth in two letters, each dated June 15, 1950, addressed to Moody, and signed by the petitioner, by Rupe as president. Moody, on behalf of himself, individually, and his companies, American National Insurance Company, Texas National, and Moody Bank, accepted this proposal on the

same date by endorsement at the bottom of each letter. The full text of the first letter is as follows:

The subject company [Baker Inc.], owner of the Baker Hotel in Dallas, has outstanding 113,000 shares of common capital stock of no par value and 13,205 shares of 3% $10.00 par value preferred stock. The common stock is owned by the following persons in the approximate amounts set opposite their names:

Fenton J. Baker_____ 50 plus percent
Chicago Voting Trust approximately_____ 35%
J. B. Adoue and Karl Hoblitzelle approximately_____ 6%

The remainder of the common stock is widely distributed in small blocks throughout the United States.

The above mentioned Chicago Voting Trust has outstanding voting trust certificates representing beneficial interests in the approximately 35% of the common stock of the subject company. Mr. P. J. Dee of Chicago, one of the voting trustees under the Chicago Voting Trust, has informed me that he and his business associates own substantially $66\frac{2}{3}$% of the outstanding voting trust certificates in such trust. Mr. Dee has orally agreed to vote in favor of the sale to us of all of the Baker Hotel stock held by the Trust at a price of $25.00 per share. Mr. Dee has assured me that his associated trustees have indicated their willingness to do likewise. I understand that the voting trust agreement provides the trustees with authority to sell the assets of the Trust upon proper notice to all certificate holders, unless $33\frac{1}{3}$% in amount of certificates outstanding evidence their protest and unwillingness to sell by written notice to the trustees, within twenty days after mailing of such notice. I anticipate no problem in effectuating the purchase of the Baker Hotel stock held by such Trust, although a period of time must elapse for the mechanics of such sale to be carried into effect by the trustees.

Mr. Fenton J. Baker and Messrs. Adoue and Hoblitzelle have agreed orally to sell their stock to us at a price of $35.00 per share, Mr. Hoblitzelle and Mr. Adoue agreeing to accept such price as might be agreeable to Mr. Baker. Mr. Baker has indicated that he will reduce the price at which his stock may be purchased by us to a price between $30.00 and $35.00. I feel that Mr. Baker will accept $32.50 per share for his stock. I believe that Messrs. Adoue and Hoblitzelle will accept $30.00 per share for their stock. The scattered shares, other than those of the Chicago Trust, Messrs. Baker, Hoblitzelle and Adoue, will have to be purchased by the submission of a bid to all alike, and I feel that such purchase can be made at a price not to exceed $30.00 per share from such of the stockholders as may elect to sell.

Both you and Mr. Whayne have had access to audit reports of the subject company for the fiscal years ended July 31, 1945, to 1948, inclusive, prepared and certified by Messrs. Fred F. Alford, Certified Public Accountants of Dallas, and financial statement of the company for the month of April, 1949, prepared by the company's accounting department.

We propose that:

(1.) Dallas Rupe and Son purchase all of the above mentioned stock at a price not in excess of $32.50 per share for Mr. Baker's stock, the stock of Messrs. Hoblitzelle and Adoue at a price not to exceed $30.00 per share, the stock of the Chicago Trust at a price not to exceed $25.00 per share, and all other stock at a price not to exceed $30.00 per share.

(2.) Dallas Rupe and Son purchase as much of the preferred stock of the company as may be available to it at a price not to exceed $10.00 per share (the par value thereof).

(3.) American National Insurance Company to issue its commitment to Baker Hotel of Dallas, Inc. for a loan of $2,500,000.00 to be secured by a first mortgage upon the land and improvements and all which now constitute the Baker Hotel, such loan to bear interest at the rate of four percentum per annum and to be amortized over a period of fifteen years.

(4.) W. L. Moody and Company to agree to lend Dallas Rupe and Son the funds necessary to the purchase of the above mentioned stock with such stock as collateral for such loan.

(5.) Texas National Hotel Company to enter into an agreement with Dallas Rupe and Son to purchase the common and preferred stocks owned by it at a price equal to the net cost of such stock to Dallas Rupe and Son, plus $1.00 per share for each of the common shares purchased and without compensation for the preferred stock purchased.

(6.) It is contemplated that substantially 90% of the common capital stock of Baker Hotel of Dallas will be acquired by Dallas Rupe and Son and re-sold to Texas National Hotel Company, but there shall exist no obligation on the part of Texas National Hotel Company to purchase any of the stock of Baker Hotel of Dallas, Inc. unless and until Dallas Rupe and Son can deliver to it 85% or more in amount of the outstanding common capital stock or firm commitments acceptable to you from reliable and responsible banks, firms or individuals to sell such stock.

If you accord with the program set forth herein, please evidence your acceptance by your signature at the space provided herein below.

The second letter, which is marked "CONFIDENTIAL," reads as follows:

I hand you herewith a letter setting forth our proposed plan for the acquisition of substantially all of the stock of the subject company by Texas National Hotel Company.

It is contemplated that upon acquisition of control of the voting stock of the hotel company, Dallas Rupe and Son will cause new directors to be installed. Such new directors will authorize the pre-payment of the existing first mortgage indebtedness of the company held by Equitable Life Assurance Society and will authorize a new first mortgage loan in amount of $2,500,000.00 to be purchased by American National Insurance Company. The excess of cash resulting from the increased first mortgage loan and the then surplus cash working funds of the company will be distributed as a dividend to the stockholders. The directors will authorize the call, prepayment and cancellation of all of the outstanding 3% preferred stock of the company. Upon completion of the above transactions, Dallas Rupe & Son will sell the common stock of Baker Hotel of Dallas, Inc. to Texas National Hotel Company at its net cost thereof plus $1.00 per share for all stock sold.

Dallas Rupe and Son will agree to continue its efforts to acquire all remaining stock outstanding at such price as you may from time to time authorize and to sell all of such stock acquired to Texas National Hotel Company.

Texas National Hotel Company to authorize Dallas Rupe and Son to cause Baker Hotel of Dallas, Inc. to enter into an employment contract with Fenton J. Baker as Vice President and General Manager of the company, for a period of three years at the same compensation presently being paid to Mr. Baker. Such three year employment contract to date from the date Dallas Rupe and Son consummates the purchase of Mr. Baker's stock.

If the procedures outlined above accord with your wishes, please evidence such fact by signing your name at the space provided.

The excess of cash, referred to in the above letter, which was to be distributed to the stockholders of Baker Inc. would amount to approximately $1,000,000.

On June 22, 1949, a formal offer was extended by the petitioner to the protective committee for the acquisition of its 39,550 shares of Baker Inc. stock. This proposal by the petitioner required securing the approval and consent of the trustee, the beneficial owners of the stock, and the United States District Court for the Northern District of Texas, Fort Worth Division. The proposal was accepted by the protective committee on June 29. On July 1 a petition to the court was filed by the committee and on the same date a court order was issued granting approval of the plan. On July 5 a notice to the participating certificate holders was prepared calling for their approval of or dissent from the proposed sale of the trust stock, within 10 days of the mailing of such notice. The notice was mailed on July 7. Also on July 5 the petitioner, in accordance with the proposal, deposited in escrow with the trustee the sum of $10,000 as earnest money. Beneficial owners of 38,353 shares approved the sale.

On July 18, 1949, the protective committee accordingly directed the trustee to transfer and deliver 38,353 shares of Baker Inc. stock to the petitioner at the price of $25 per share and the sale was consummated the same day for a total consideration of $958,825. On the standard invoice form issued by the petitioner it was represented that the purchase was made by it as principal and for its own account. The certificates for these shares were delivered by the seller directly to the Republic National Bank of Dallas as transfer agent.

Meanwhile, on July 14, 1949, the petitioner had acquired 56 per cent of the Baker Inc. stock, the certificates being delivered directly to the Republic National Bank for transfer into the petitioner's name, as follows:

| Seller | Number of shares | Price per share | Total price |
|---|---|---|---|
| Fenton J. Baker and Mrs. Louise Scott Baker | 56,858 | $32.50 | $1,847,885 |
| Karl Hoblitzelle | 1,500 | 30.00 | 45,000 |
| Hoblitzelle Foundation | 1,500 | 30.00 | 45,000 |
| J. B. Adoue, Jr | 3,061 | 30.00 | 91,830 |
| J. B. Adoue, III | 128 | 30.00 | 3,840 |
| Mrs. Katherine Gallaway | 100 | 30.00 | 3,000 |
| Total | 63,147 | | 2,036,555 |

The invoice issued by the petitioner relating to each of these transactions represented that the purchases were for the petitioner as principal and for its own account. At the time of the acquisition of the above 56 per cent of the stock, Rupe had satisfied himself that he

would be able to acquire at least 85 per cent of the total outstanding common stock of Baker Inc.

At special meetings of the board of directors of Baker Inc. held on July 14 and July 18 resignations of the old officers and directors were submitted and accepted. Officers and directors elected to Baker Inc. at that time in place of those who resigned were nominees of the petitioner and all held executive positions with the petitioner. None of them was an officer in or connected with any of the Moody organizations—American National Insurance Company, Texas National, or Moody Bank. None of these officers of the petitioner received any compensation from Baker Inc. for services rendered as officers or directors of that company in 1949, except that Rupe received a director's fee of $540. At the directors' meeting of July 14 the directors authorized a 3-year employment contract with Fenton J. Baker as manager of the hotel.

During the month of June 1949, the petitioner had commenced solicitation for other shares of Baker Inc. common stock which were widely held by the public, and on July 25, 1949, a printed offer was sent by it to the approximately 800 remaining holders of common stock. Pursuant to such offer a total of 6,205 shares was acquired by the petitioner prior to October 7, 1949, from approximately 480 stockholders throughout the United States. The cost thereof was $25 per share, except for 40 shares which cost $30 per share.

During the period July 14, 1949, through September 26, 1949, the petitioner's acquisitions of Baker Inc. common stock amounted to 107,705 shares, being approximately 96 per cent of the total of 113,000 shares of common stock outstanding. The common stock certificates acquired by the petitioner were canceled and new certificates were issued to the petitioner.

The petitioner borrowed money from Moody Bank on six occasions between July 14, 1949, and September 21, 1949, for use in purchasing common stock of Baker Inc. It gave 90-day notes in each instance. These notes did not provide for payment of interest, unless not paid at maturity, in which case interest at the rate of 10 per cent was to be paid. On each occasion the petitioner drew a draft on Moody Bank for the amount of the loan. In each instance the note executed by the petitioner for the amount of the draft, certain Baker Inc. stock certificates, and a stock power executed by the petitioner in blank covering such certificates were forwarded to Moody Bank with each of these drafts. The stock certificates and the stock powers were in the form commonly used for pledging collateral on loans. Each loan from Moody Bank was equal to the exact cost of acquisition by the petitioner of the shares forwarded with each draft and note, with the exception of the 250 shares which the petitioner had previously

owned. These 250 shares were included in the certificates forwarded to Moody Bank with the note dated July 15, 1949, and for purposes of these transactions with the Moody interests (including the fixing of the selling price) were treated as having a cost of $30 per share.

The date of each note and draft, the amount thereof, the number of shares of common stock of Baker Inc. delivered to Moody Bank concurrently with the note and draft, and the acquisition cost to the petitioner of such shares are as follows:

| Date of notes and drafts | Amount of loan | Number of shares | Cost of shares |
|---|---|---|---|
| July 15, 1949 | $2,048,455 | 63,573 | $2,048,455 |
| July 19, 1949 | 958,825 | 38,353 | 958,825 |
| Aug. 5, 1949 | 34,150 | 1,366 | 34,150 |
| Aug. 18, 1949 | 45,000 | 1,800 | 45,000 |
| Aug. 30, 1949 | 26,750 | 1,070 | 26,750 |
| Sept. 21, 1949 | 39,850 | 1,586 | 39,850 |
| Total | 3,153,030 | 107,748 | 3,153,030 |

The proceeds of the loans from Moody Bank were credited to the petitioner's account at the Republic National Bank and checks were drawn by the petitioner against that account in payment for the shares of stock of Baker Inc.

On June 8, 1949, the board of directors of Baker Inc. declared the regular dividend of 65 cents per share payable on July 30, 1949, to common stockholders of record on July 25, 1949. This dividend in the amount of $73,450 was duly paid on July 30, 1949. The petitioner received $66,641.90 of such dividend as the record owner of 102,526 shares, and deposited the same in its account with the Republic National Bank.

At a special meeting of the board of directors of Baker Inc. held on September 19, 1949, a resolution was adopted which authorized prepayment of the mortgage indebtedness to the Equitable Life Assurance Society in the amount of $1,563,100. Another resolution was adopted which authorized redemption of the 13,205 shares of $10-par-value preferred stock of Baker Inc. which was callable at par.

At a subsequent meeting of the board on September 26, 1949, a resolution was adopted authorizing a mortgage loan to be placed with American National Insurance Company for $2,500,000. The resolution further authorized application of the proceeds of this new loan in prepayment and redemption of the outstanding mortgage indebtedness, redemption of the preferred stock, and payment of a dividend on the common stock. Thereupon a dividend of $9 per share, totaling $1,017,000 was declared on the common stock, payable to stockholders of record on October 1, 1949.

Accordingly, on September 30, 1949, a new first mortgage loan was given Baker Inc. by American National Insurance Company

in the amount of $2,500,000. The proceeds of this new loan and Baker Inc.'s accumulated cash on hand were utilized to redeem and discharge the mortgage indebtedness owed the Equitable Life Assurance Society in the amount of $1,563,100, to redeem the 13,205 shares of preferred stock of Baker Inc. at a cost of $132,050, and to pay the special dividend of $9 per share on the Baker Inc. common stock on October 4, 1949, in the total amount of $1,017,000. The redemption and retirement of the preferred stock was accomplished at some time after October 10, 1949.

As the record owner of 108,010 shares of Baker Inc. common stock the petitioner received a dividend of $9 per share, amounting to $972,090. The petitioner deposited this dividend in its account with the Republic National Bank.

At a special meeting of the board of directors of Baker Inc. held on October 6, 1949, a resolution was adopted approving a management contract with National Hotel Company, one of the Moody enterprises, for the latter to supervise the management and operation of the Baker Hotel as a unit of the chain operation supervised by National Hotel Company.

On October 7, 1949, a number of transactions took place concurrently. The petitioner deposited in its account at Moody Bank a check in the amount of $925,106.90, dated October 6, 1949, drawn on its account with the Republic National Bank. Texas National issued its check payable to the petitioner in the amount of $2,227,923.10. The petitioner also deposited this check in its account at Moody Bank, the two deposits totaling $3,153,030. All the six notes of the petitioner heretofore referred to in favor of Moody Bank in the total amount of $3,153,030 were thereupon paid by the petitioner's check drawn on its account at Moody Bank and delivered to Moody Bank. (No interest was incurred or paid on such notes.) All such notes were then stamped "Paid" by Moody Bank and the canceled notes and certificates for 107,748 shares of Baker Inc. common stock, which had been held as collateral by Moody Bank, were delivered to the petitioner. Thereupon the petitioner transferred and delivered 107,955 shares of Baker Inc. common stock to Texas National.

In its invoice the petitioner represented that the stock was sold by it as principal and for its own account. An assignment dated October 7, 1949, was also drawn up by the petitioner to reflect the transfer of the 107,955 shares to Texas National.

The check for $2,227,923.10 which was issued by Texas National, payable to the petitioner, was based upon the following computation submitted by the petitioner to Texas National:

```
Total  purchases—107,955  shares_____   $3,158,205.00
Less:
    Annual  dividend  paid  on  7/30/49  on  102,526
        shares_____  $66,641.90
    Special  dividend  paid  on  10/3/49  on  107,955
        shares_____  971,595.00
                                                    _____   1,038,236.90

                                                                   2,119,968.10
Plus profit of $1 per share on 107,955 shares_____      107,955.00

    Balance due from sale of stock_____      2,227,923.10
```

Also on October 7, 1949, resignations of the petitioner's appointees who had served as officers and directors of Baker Inc. were submitted. These were accepted at a directors' meeting on October 10, 1949. Thereupon nominees of Texas National were elected officers and directors.

After the payment of the common stock dividend of $9 per share the petitioner continued to purchase stock of Baker Inc. as provided in the agreement of June 15, 1949. Before the close of the fiscal year ended June 30, 1950, it had acquired an additional 1,006 shares, all of which were assigned, transferred, and delivered to Texas National in accordance with the June 15, 1949, agreement for the sum of $16,542.15.

A summary of the transactions in Baker Inc. stock for the entire fiscal year ended June 30, 1950, and the computation of the total amount paid by Texas National to the petitioner is as follows:

```
Baker Inc. stock acquired by petitioner—108,961 shares (includ-
    ing petitioner's 250 shares at assumed cost of $30 per share)__  $3,174,236.15
Dividends received:
    102,526 shares at 65 cents per share_____  $66,641.90
    108,010 shares at $9 per share_____   972,090.00
                                                     _____
    Total  dividends_____   1,038,731.90

                                                                      2,135,504.25
Plus amount received on 108,961 shares at $1 per share_____      108,961.00

Paid by Texas National_____       2,244,465.25
```

All of the purchases by the petitioner of the Baker Inc. stock during the fiscal year ended June 30, 1950, were recorded on the petitioner's books and were carried as inventory securities. Federal and State stock transfer taxes were paid upon acquisition of the stock by the petitioner and upon transfer of the stock by the petitioner to Texas National. For accounting purposes the petitioner included all dividends received by it as record holder of the Baker Inc. stock as dividend income to it.

In its corporate income tax return for the fiscal year ended June 30, 1950, the petitioner claimed an ordinary loss from sales of inventory securities, included in which was a loss from the sale of the Baker Inc. stock which it carried as inventory securities. The specific amount of loss claimed on the Baker Inc. stock is not shown in the return, but the parties appear to agree that such claimed loss was $927,430.28, which is the difference between a cost of $3,166,736.15 and a selling price of $2,239,305.87. In its return the petitioner reported commission income in the amount of $110,605.90, but this did not include the $1 per share received on account of the Baker Inc. stock. Rather, such $1 per share was included in the reported selling price of $2,239,305.87. It reported long-term capital gain of $3,719.38 on the sale of the 250 shares of Baker Inc. stock which it carried in its investment account, calculated upon the basis of the actual cost of $1,440 and a selling price of $5,159.38. In its return it included dividend income from Baker Inc. in the amount of $1,038,737 and claimed a dividends-received credit of 85 per cent of $157,392.45, the reported adjusted net income.

In determining the income tax deficiency, the respondent disallowed the claimed loss from sale of Baker Inc. stock with the statement that "[i]t has been determined that you had no loss from the sale of such stock." The respondent also held that the petitioner received a commission of $108,896 for services in obtaining the stock of Baker Inc. for Texas National, and since this had not been reported as such, increased reported income by that amount. He further held that the amount of $1,038,641.90 which the petitioner had included as dividends from Baker Inc. did not represent dividends received by the petitioner, but actually represented a reimbursement to the petitioner of a portion of the cost to the petitioner of the stock of Baker Inc. acquired for Texas National. He accordingly eliminated such income, with a consequent adjustment of the dividends-received credit to which the petitioner was entitled. He further held that the petitioner did not have gain from the sale of 250 shares of stock of Baker Inc., and eliminated the capital gain of $3,719.38, which the petitioner had reported. The net effect of the respondent's determination apparently was to include in ordinary income some amount representing gain on the sale of the 250 shares.

The petitioner also filed a personal holding company tax return for the same year, in which it reported a personal holding company surtax of $4,200, which was paid. In order to mitigate the impact of the personal holding company tax, the petitioner declared special dividends on its class A and class B stocks in the aggregate amount of $63,337.30. The special dividend received by Rupe, his wife, and his mother amounted to $35,303.44, upon which they paid Federal income taxes totaling $18,688.57.

As a result of his determination that for income tax purposes the amount of $1,038,641.90 did not represent dividends to the petitioner, the respondent held that the petitioner was not a personal holding company and held that there had been an overassessment of personal holding company tax in the amount of $4,200.

In purchasing the stock of Baker Inc. and transferring it to Texas National during the taxable year the petitioner was not acting in its own behalf as principal, but was acting as agent for Texas National; the petitioner did not have beneficial ownership of such stock; the dividends paid on such stock were not owned by the petitioner beneficially; in transferring such shares to Texas National the petitioner sustained no loss; and the petitioner was paid a commission of $1 per share or $108,711, for acting as agent of Texas National in acquiring the stock and transferring it to Texas National.

### OPINION.

The petitioner contends that it was the beneficial owner of dividends in the amount of $1,038,731.90 which it received during the taxable year as the record holder of the stock of Baker Inc. and is therefore entitled to a dividends-received credit with respect thereto pursuant to section 26 (b) of the Internal Revenue Code of 1939.[1] It also contends that it sold the stock of Baker Inc. to Texas National and thereby sustained an ordinary loss of $927,430.28. On the other hand the respondent determined that the petitioner was not the beneficial owner of the dividends in question and hence not entitled to the dividends-received credit and that it is not entitled to deduct the loss claimed, but rather, that the petitioner received ordinary income in the amount of $108,896 as commission for services in obtaining the stock of Baker Inc. for Texas National.

There can be no question that, as contended by the petitioner, a taxpayer has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits. *Gregory* v. *Helvering*, 293 U. S. 465. However, in that case the Supreme Court refused to be bound by the formalities employed and looked to the substance of the transaction involved. That Court has repeatedly taken the position that the incidence of taxation depends upon the substance of a transaction. *Commissioner* v. *Court*

---

[1] SEC. 26.  CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

   \*        \*        \*        \*        \*        \*

  (b) DIVIDENDS RECEIVED.—An amount equal to the sum of—

    (1) IN GENERAL.—85 per centum of the amount received as dividends \* \* \* from a domestic corporation which is subject to taxation under this chapter.

   \*        \*        \*        \*        \*        \*

\* \* \* In no event shall the credit allowed by this subsection exceed 85 per centum of the adjusted net income \* \* \*

*Holding Co.*, 324 U. S. 331. And in *Griffiths* v. *Helvering*, 308 U. S. 355, it further stated:

We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U. S. 376, 378, 50 S. Ct. 336, 74 L. Ed. 916. And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. Cf. *Gregory* v. *Helvering*, 293 U. S. 465 * * *

A careful analysis of the entire transaction in question leads us inevitably to the conclusion that, although in all formal respects it was represented to be a purchase of stock by the petitioner and a later sale to Texas National, it in reality constituted a purchase by the petitioner of the stock on behalf of Texas National, which latter company thereby acquired the beneficial ownership of the stock. The record clearly indicates that the petitioner had no intention or desire to purchase the beneficial ownership of the Baker Inc. stock for itself; on the contrary it was acting entirely to accommodate Texas National. All purchases were made because of the contract with Moody and his three controlled enterprises, American National Insurance Company, Texas National, and Moody Bank.

In the spring of 1949, Rupe, president of the petitioner, learned that there was a possibility that holders of approximately 91 per cent of the stock of Baker Inc. might be willing to sell their stock, and obtained informal commitments from stockholders owning 56 per cent of the stock to sell their stock for $30 to $35 per share. Rupe asked Moody whether he or any of his enterprises were interested in acquiring control of Baker Inc. Whether this transpired before Rupe obtained the informal commitments regarding the 56 per cent interest is not entirely clear from the record, but we deem this unimportant. Moody was interested in having his corporation, Texas National, acquire the stock if it could acquire at least 85 per cent of the stock. However, Moody did not desire to acquire the corporation so long as it had an undistributed earned surplus of approximately $1,500,000. In addition, he advised Rupe that Texas National did not wish to make an outlay in excess of $2,500,000. Obviously, as the parties recognize, the only way to eliminate the earned surplus was to declare a dividend. One method of meeting Moody's desires would have been for the old stockholders of Baker Inc. to cause a dividend to be paid to them. However, the record is silent as to whether any discussions were had in that regard. It may well be that such stockholders were unwilling to subject themselves to tax liability upon such a dividend.

Rupe had several conversations with Moody, as a result of which a contract was executed between the petitioner, by Rupe as president,

and Moody on behalf of himself and his three enterprises, American National Insurance Company, Texas National, and Moody Bank. Under that contract the petitioner agreed to purchase some of the Baker Inc. stock at a price not in excess of $32.50 per share, some at not to exceed $30 per share, certain other shares at not to exceed $25 per share, and all other shares at not to exceed $30 per share. American National Insurance Company agreed to loan Baker Inc. $2,500,000, which was to be used to pay off an existing mortgage of $1,500,000, the excess of approximately $1,000,000 to be distributed as a dividend. Moody Bank agreed to lend the funds necessary to purchase the stock. Texas National agreed to purchase the stock at a price equal to the net cost of the stock to the petitioner, plus $1 per share for each of the common shares. In the contract it was provided that there would be no obligation on the part of Texas National to purchase any stock unless and until the petitioner could deliver to it 85 per cent or more of the common stock or firm commitments from stockholders to sell such stock.

The petitioner on July 14, 1949, acquired 56 per cent of the Baker Inc. stock and on July 18, 1949, it acquired an additional 34 per cent of the stock. In each instance the money for the purchase was advanced by Moody Bank and the stock was pledged for repayment of the loan. American National Insurance Company made the loan of $2,500,000 to Baker Inc., the old mortgage was paid off, and a special dividend of $9 per share was declared, in addition to the regular dividend of 65 cents per share. Thereafter, on October 7, the petitioner transferred and delivered to Texas National 107,705 shares of Baker Inc. stock which it had purchased during the year and 250 shares which it had originally acquired in prior years for its own investment account. Thereupon, Texas National issued its check to the petitioner in the amount of $2,227,923.10 and the petitioner used such money and an amount of $925,106.90 to pay off the total of the amounts which had been advanced by Moody Bank. After paying the amount of $925,106.90 out of the dividends of $1,038,236.90 on the Baker Inc. stock which the petitioner accounted for on October 7, the remainder of the dividend was available to apply to the fee of $1 per share on the 107,705 shares, and the selling price of the 250 shares. Thereafter, other shares were purchased by the petitioner during the taxable year and transferred to Texas National and payment therefor was made to the petitioner directly by Texas National, including the $1 per share.

The petitioner makes much of the fact that from July 14 to July 18 it held title to only 56 per cent of the stock, pointing out that the contract did not obligate Texas National to purchase any stock unless it could obtain at least 85 per cent of the total outstanding stock.

From this it argues that it must have been buying on its own account since it assumed the risk that the contract might not be carried out. We think this does not follow. The only reason any of the purchases were made was because of the contract with Texas National, and it seems apparent that the petitioner would not have bought the 56 per cent unless it had been reasonably sure it could obtain enough other stock to amount to 85 per cent. Indeed, Rupe testified that at the time the petitioner acquired the 56 per cent, he had satisfied himself that it could acquire 85 per cent. No reason is shown why the petitioner could not have waited an additional 4 days to acquire the 56 per cent and thereby eliminate whatever risk it took. We think the answer is that any risk was so remote as to be negligible.

It may be observed that except for whatever slight risk the petitioner might have taken by purchasing 56 per cent of the stock 4 days before the acquisition of the trusteed shares, the petitioner, under this contract, assumed no risk whatever. The Moody interests bound themselves to furnish the money for the purchase of the stock and agreed to pay the petitioner its net cost, plus $1 per share. The contract in effect guaranteed the petitioner against any loss, and indeed it had none. Instead it received a fee of $1 per share. Furthermore, the dividends which the petitioner received were certainly not available to it for its own use. They, together with the net amounts to be paid by Texas National, were to be used, and were used, to repay to Moody Bank the amounts advanced for the purchase of the stock. During the time the petitioner held record title to the stock it was not entitled to the benefit of the earnings of Baker Inc. or any enhancement in the value of its stock, nor would it suffer any loss in the event of a decrease in the value of the stock.

On brief the petitioner states that the contractual arrangements between it and Texas National were not designed to result in a tax benefit or saving to the petitioner; that to the contrary, the tax benefits were to accrue to Texas National, principally by virtue of the elimination of approximately $1,000,000 of earned surplus of Baker Inc. It states that the agreement was designed to eliminate that much surplus and to reduce the purchase price *before* the stock was acquired by Texas National.

It is the petitioner's argument that the various steps provided for in the contract were conditions precedent to the transfer of beneficial ownership to Texas National. However, we think it clear that the carrying out of these various steps was the very service for which the petitioner was being paid the commission of $1 per share. We do not question the petitioner's statement on brief that the transaction was not designed to result in a tax benefit or saving to the petitioner, and we have no reason to doubt Rupe's testimony that he was not

even aware of the possibility that the petitioner might be entitled to a dividends-received credit. But, certainly one of the purposes, as indicated above, was to benefit Texas National taxwise, and this also was one of the services performed by the petitioner in consideration of the commission of $1 per share.

In support of its contention that it was not acting as agent for the Moody interests, but that it was acting on its own behalf as principal or independent contractor, the petitioner cites several cases of the Texas Civil Court of Appeals for the proposition that the relation of agency is the consensual relation existing between two persons, by virtue of which one of them is to act for and in behalf of the other and subject to his control. *Aetna Life Ins. Co.* v. *McIver*, 65 S. W. 2d 817; *Bertrand* v. *Mutual Motor Co.*, 38 S. W. 2d 417; *Tarver Steele & Co.* v. *Pendleton Gin Co.*, 25 S. W. 2d 156; and *Priddy* v. *Childers*, 248 S. W. 144. However, the creation of a relationship of principal and agent does not depend upon the precise language used, but upon the spirit and essence of the contract considered as a whole. *Carruth* v. *Valley Ready-Mix Concrete Co.*, (Tex. Civ. App.) 221 S. W. 2d 584, citing 2 C. J. S., Agency, sec. 2. We think the control requisite to constitute a relationship of principal and agent was present. The contract itself specifically provides for the steps to be taken by the petitioner. In addition, correspondence and other evidence of record indicate that there was actual supervision and control throughout the period the transactions were being carried out. For example, Exhibit LL, attached to the stipulation, shows that the manner and time of payment of the existing mortgage indebtedness on the properties of Baker Inc. were directed by the Moody interests.

We think the relationship between the petitioner and the Moody interests was clearly one of agency. This case is not to be distinguished from the usual case where one buys property for another at a specified price and receives a commission for such service. *Frankfort Broom Co.* v. *Western Warehouse Co.*, (C. A. 8) 200 F. 398, and *Foley* v. *Nimocks*, 175 Iowa 464, 157 N. W. 178. We think, as did the court in the latter case, that the fact that the property was purchased in the name of the agent is not determinative. It is well established that brokers, lawyers, and other similar persons employed for a single transaction or for a series of transactions are agents, although as to their physical activities they may be independent contractors. See Restatement, Agency, sec. 1 (d), cited in *Pyle* v. *Ely & Walker Dry Goods Co.*, (C. A. 5) 179 F. 2d 677; and 8 Am. Jur., Brokers, secs. 2, 4. Since, as we have concluded, the petitioner was acting as agent for Texas National, the dividends paid on the stock did not belong to it beneficially, under the well established

rule that dividends on securities in the hands of a broker belong to the customer. See *Richardson* v. *Shaw*, 209 U. S. 365, 367, and Meyer, The Law of Stock Brokers and Stock Exchanges, sec. 42 (4).

We accordingly conclude that as respects the stock of Baker Inc., which the petitioner purchased pursuant to the contract and transferred to Texas National, the petitioner was not the beneficial owner thereof; that it was not the beneficial owner of the dividends declared thereon and hence is not entitled to a dividends received credit with respect thereto; that upon the transfer of such stock to Texas National the petitioner sustained no loss; and that the petitioner received ordinary income in the amount of $108,711 as commissions upon the acquisition of the stock for Texas National.

As respects the 250 shares of Baker Inc. stock which the petitioner had acquired in prior years, the parties are now in agreement on brief that the petitioner derived a long-term capital gain in the amount of $6,310 upon the sale thereof to Texas National. This figure has been calculated by treating the selling price as $31 per share. This agreement will be given effect in the recomputation under Rule 50. In view of this agreement, consistency requires that the petitioner be not also taxed upon the receipt of the dividends in the amount of $9.65 per share which was paid upon this stock, since it is clear from the evidence that the petitioner certainly did not receive, either as dividends or selling price, more than a total of $31 per share from this stock.

*Decision will be entered under Rule 50.*