**RUPE INVESTMENT CORPORATION,
Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 17466.**

United States Court of Appeals
Fifth Circuit.

April 20, 1959.

Rehearing Denied May 28, 1959.

Robert F. Ritchie and Ritchie, Ritchie & Crosland, Dallas, Tex., for petitioner.

George W. Beatty, A. F. Prescott, Carter Bledsoe, Dept. of Justice, Washington, D. C., John M. Morawski, Sp. Atty., I.R.S., Arch M. Cantrall, Chief Counsel, I.R.S., Washington, D. C., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for respondent.

Before RIVES, CAMERON, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This appeal focuses on the tax consequences of the sale of the Baker Hotel in Dallas, Texas. In 1949 Rupe Investment Corporation, the taxpayer, was the record owner of 108,010 shares of Baker Hotel common stock at the time when the hotel company paid a dividend of $9 a share. In its 1950 return Rupe Investment claimed a dividend received credit (85%) for the dividends ($972,-090) on the Baker Hotel stock, under § 26(b) of the Internal Revenue Code of 1939.[1] In the taxpayer's schedule of sales of inventory securities, the taxpayer claimed an ordinary loss ($927,-430.28) upon the sale of the Baker, Inc., stock. The Commissioner of Internal Revenue took the position that beneficial ownership of the stock and dividends was in the Texas National Hotel Company, for whom the taxpayer acted as agent or broker; that the taxpayer held title for convenience only. The Tax Court upheld the Commissioner. The Commissioner assessed a tax deficiency against Rupe Investment for $29,-188.09 for the taxable year ending June 30, 1950. 30 T.C. 240. We affirm.

## I.

Most of the facts are stipulated. The question on this appeal is whether the Tax Court drew the correct inferences from the undisputed facts.

Rupe Investment Corporation, the taxpayer, is in the business of investment banking. It has been closely identified with banking for the hotel industry. Baker Hotel of Dallas, Inc., owned the Baker Hotel, one of the leading hotels in Dallas, Texas. Dallas Gordon Rupe, president of Rupe Investment Corporation, has been a director of Baker, Inc., since 1936. He owns 250 shares of the common stock of Baker, Inc., acquired some time between 1940 and 1944.

In 1949 and 1950 the issued and outstanding stock of Baker, Inc., consisted of 113,000 shares of no par value common stock and 13,205 shares of $10 preferred stock. Fenton J. Baker, president and general manager of the hotel, and his wife owned slightly more than fifty per cent of the common stock. The National Bank of Commerce held thirty-five per cent of the stock (39,550 shares), as Trustee for a Protective Committee for bondholders of a predecessor corporation.

In the spring of 1949 Rupe learned at a meeting of the board of directors of Baker, Inc., that an offer had been made to purchase the stock interest of the Protective Committee at $25 a share, conditioned on the purchaser gaining control of the corporation. Rupe then talked with Baker with regard to the possibility of Baker selling his fifty per cent stock interest. After several conferences, Baker indicated that he would sell at $35 a share. As a result of these conferences, the Rupe Investment Corporation secured

[1] "§ 26 Credits of Corporations. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * * (b) Dividends Received. An amount equal to the sum of—(1) In general. 85 per centum of the amount received as dividends * * * from a domestic corporation which is subject to taxation under this chapter. * * * In no event shall the credit allowed by this subsection exceed 85 per centum of the adjusted net income * * *." 26 U.S.C.A. 1952 ed., § 26.

informal commitments from Baker and some of his close associates to sell their stock for $30 to $35 per share. This block represented approximately fifty-six per cent of the stock of Baker, Inc.

At some time during these negotiations Rupe asked W. L. Moody, Jr., of Galveston, Texas, if he or any of his enterprises were interested in acquiring control of Baker, Inc. Moody interests included the Texas National Hotel Company, American National Insurance Company, and W. L. Moody & Company, Bankers, an unincorporated banking firm, to mention the Moody-controlled corporations concerned in this case. Moody, speaking for Texas National, at first said that he would be interested in purchasing the physical properties of Baker, Inc., but not the stock, because the company's

financial structure then included an un-distributed earned surplus of approximately $1,500,000. He stated, however, that Texas National would purchase the stock if: (1) the earned surplus were reduced, (2) eighty-five per cent of the common stock could be acquired, and (3) the investment in common stock would not exceed $2,500,000. The Baker Hotel was encumbered with a first mortgage loan from the Equitable Life Assurance Society of the United States in the amount of approximately $1,500,000. Moody said that American National Insurance Company would carry the first mortgage loan on the Baker Hotel.

In June 1949 Rupe submitted a proposal in accordance with Moody's terms. This proposal was set forth in two letters (quoted in full in the footnote),[2] both

2. The first letter provided as follows:

"The subject company [Baker, Inc.] owner of the Baker Hotel in Dallas, has outstanding 113,000 shares of common capital stock of no par value and 13,205 shares of 3% $10.00 par value preferred stock. The common stock is owned by the following persons in the approximate amounts set opposite their names:

Fenton J. Baker—50 plus percent
Chicago Voting Trust approxi-
 mately—35%
J. B. Adoue and Karl Hoblitzelle
 approximately— 6%

The remainder of the common stock is widely distributed in small blocks throughout the United States.

"The above mentioned Chicago Voting Trust has outstanding voting trust certificates representing beneficial interests in the approximately 35% of the common stock of the subject company. Mr. P. J. Dee of Chicago Voting Trust, has informed me that he and his business associates own substantially 66 2/3% of the outstanding voting trust certificates in such trust. Mr. Dee has orally agreed to vote in favor of the sale to us of all of the Baker Hotel stock held by the Trust at a price of $25.00 per share. Mr. Dee has assured me that his associated trustees have indicated their willingness to do likewise. I understand that the voting trust agreement provides the trustees with authority to sell the assets of the Trust upon proper notice to all cerificate holders, unless 33 1/3% in amount of certificates outstanding evidence their protest and un-willingness to sell by written notice to

the trustees, within twenty days after mailing of such notice. I anticipate no problem in effectuating the purchase of the Baker Hotel stock held by such Trust, although a period of time must elapse for the mechanics of such sale to be carried into effect by the trustees.

"Mr. Fenton J. Baker and Messrs. Adoue and Hoblitzelle have agreed orally to sell their stock to us at a price of $35.00 per share, Mr. Hoblitzelle and Mr. Adoue agreeing to accept such price as might be agreeable to Mr. Baker. Mr. Baker has indicated that he will re-duce the price at which his stock may be purchased by us to a price between $30.00 and $35.00. I feel that Mr. Baker will accept $32.50 per share for his stock. I believe that Messrs. Adoue and Hob-litzelle will accept $30.00 per share for their stock. The scattered shares, other than those of the Chicago Trust, Messrs. Baker, Hoblitzelle and Adoue, will have to be purchased by the submission of a bid to all alike, and I feel that such purchase can be made at a price not to exceed $30.00 per share from such of the stockholders as may elect to sell.

"Both you and Mr. Shayne have had access to audit reports of the subject company for the fiscal years ended July 31, 1945, to 1948, inclusive, prepared and certified by Messrs. Fred F. Alford, Certified Public Accountants of Dallas, and financial statement of the company for the month of April, 1949, prepared by the company's accounting department.

"We propose that: (1) Dallas Rupe and Son purchase all of the above men-tioned stock at a price not in excess of

dated June 15, 1950, addressed to Moody and signed by Rupe as president of Rupe Investment Corporation. Moody accepted the proposal.

As is evident from this agreement, Rupe was closely restricted as to the ceiling price he could pay for the common stock: $32.50 for the Bakers' stock (50%); $30.00 a share for stock held by Hoblitzelle and Adoue (6%); $25 a share for the trusteed stock (35%); $30 a share for all other stock (9%). Rupe was to pay not more than $10 a share for available preferred stock. In return,

$32.50 per share for Mr. Baker's stock, the stock of Messrs. Hoblitzelle and Adoue at a price not to exceed $30.00 per share, the stock of the Chicago Trust at a price not to exceed $25.00 per share, and all other stock at a price not to exceed $30.00 per share. (2) Dallas Rupe and Son purchase as much of the preferred stock of the company as may be available to it at a price not to exceed $10.00 per share (the par value thereof). (3) American National Insurance Company to issue its commitment to Baker Hotel of Dallas, Inc., for a loan of $2,500,000.00 to be secured by a first mortgage upon the land and improvements and all which now constitute the Baker Hotel, such loan to bear interest at the rate of four percentum per annum and to be amortized over a period of fifteen years. (4) W. L. Moody and Company to agree to lend Dallas Rupe and Son the funds necessary to the purchase of the above mentioned stock with such stock as collateral for such loan. (5) Texas National Hotel Company to enter into an agreement with Dallas Rupe and Son to purchase the common and preferred stocks owned by it at a price equal to the net cost of such stock to Dallas Rupe and Son, plus $1.00 per share for each of the common shares purchased and without compensation for the preferred stock purchased. (6) It is contemplated that substantially 90% of the common capital stock of Baker Hotel of Dallas will be acquired by Dallas Rupe and Son and re-sold to Texas National Hotel Company, but there shall exist no obligation on the part of Texas National Hotel Company to purchase any of the stock of Baker Hotel of Dallas, Inc. unless and until Dallas Rupe and Son can deliver to it 85% or more in amount of the outstanding common capital stock or firm commitments acceptable to you from reliable and responsible banks, firms or individuals to sell such stock. "If you accord with the program set forth herein, please evidence your acceptance by your signature at the space provided herein below."

The second letter dealt with the mortgage:

"I hand you herewith a letter setting forth our proposed plan for the acquisition of substantially all of the stock of the subject company by Texas National Hotel Company.

"It is contemplated that upon acquisition of control of the voting stock of the hotel company, Dallas Rupe and Son will cause new directors to be installed. Such new directors will authorize the pre-payment of the existing first mortgage indebtedness of the company held by Equitable Life Assurance Society and will authorize a new first mortgage loan in amount of $2,500,000.00 to be purchased by American National Insurance Company. The excess of cash resulting from the increased first mortgage loan and then surplus cash working funds of the company will be distributed as a dividend to the stockholders. [The excess of cash to be distributed to the stockholders of Baker, Inc., would amount to approximately $1,000,000, that is, the difference between the old mortgage of $1,500,000 and the new mortgage of $2,500,000.] The directors will authorize the call, prepayment and cancellation of all of the outstanding 3% preferred stock of the company. Upon completion of the above transactions, Dallas Rupe & Son will sell the common stock of Baker Hotel of Dallas, Inc. to Texas National Hotel Company at its net cost thereof plus $1.00 per share for all stock sold.

"Dallas Rupe and Son will agree to continue its efforts to acquire all remaining stock outstanding at such price as you may from time to time authorize and to sell all of such stock acquired to Texas National Hotel Company. Texas National Hotel to authorize Dallas Rupe and Son to cause Baker Hotel of Dallas, Inc. to enter into an employment contract with Fenton J. Baker as Vice President and General Manager of the company, for a period of three years at the same compensation presently being paid to Mr. Baker. Such three year employment contract to date from the date Dallas Rupe and Son consummates the purchase of Mr. Baker's stock.

"If the procedures outlined above accord with your wishes, please evidence such fact by signing your name at the space provided."

Texas National agreed to purchase the common stock at a price of the net cost of such stock to Rupe, plus a dollar a share for each share purchased. Texas National agreed to buy the preferred, *"without compensation [to Rupe]* for the preferred stock purchased". The Moody Bank was to furnish necessary funds to finance Rupe's purchases. American National would lend funds to the hotel corporation to be used to pay off the Equitable mortgage and to distribute a dividend to the stockholders of approximately $1,000,000 while record title was in Rupe. The dividend would reduce the undistributed earned surplus and reduce Texas National's investment to $2,500,000.

The taxpayer emphasizes the risk involved in his purchasing stock without any certainty of obtaining the necessary 85% interest which Moody required. Before the proposal was made, however, Baker had agreed to sell at a price between $30 and $35 a share; Adoue and Hoblitzelle had agreed to sell at a price agreeable to Baker; one of the voting trustees, controlling 66⅔ of the outstanding voting trust certificates, had agreed to vote in favor of a sale at $25 a share. Rupe stated in his proposal that he anticipated "no problem in effectuating the purchase of the Baker Hotel stock held by such trust". As he said, he "contemplated that substantially 90%" could be acquired in accordance with his negotiations. Rupe's risk was negligible, if not non-existent. And he had W. L. Moody, Jr. to supply the money to purchase the stock.

June 22, 1949 the taxpayer made a formal offer to the Protective Committee to purchase its 39,550 shares of Baker, Inc. stock. The proposal required the approval of the trustee, the beneficial owners of the stock, and the United States District Court for the Northern District of Texas. The Protective Committee accepted the proposal June 29, and the court issued an order July 5 approving the plan, subject to the approval of the beneficial owners. Beneficial owners of 38,353 shares approved the sale, and on July 18, 1949 the Protective Committee directed the trustee to transfer and deliver 38,353 shares to the taxpayer at $25 a share.

Meanwhile, July 14, 1949, Rupe Investment Corporation purchased from Fenton J. Baker and his associates fifty-six per cent of the stock. During the period from July 14, 1949 to September 26, 1949 the taxpayer acquired 107,705 shares of the common stock of Baker, Inc. This was approximately ninety-six per cent of the outstanding common stock.

All of the purchases were financed by Moody through the Moody Bank. Between July 14, 1949, and September 21, 1949, the taxpayer borrowed funds from the Moody Bank six times, giving in return ninety day notes. The notes were interest free unless paid after maturity. Each loan was equal to the exact cost of acquisition of the particular block of stock that was being purchased.

June 8, 1949, the Board of Directors of Baker, Inc. declared a regular dividend of sixty-five cents payable on July 30, 1949, to common stockholders of record on July 25, 1949. Rupe Investment was record owner of 102,526 shares at that time, and received $66,641.90.

In September the Board of Directors took the final steps to consummate the Rupe-Moody agreement. (1) The Board declared a dividend of nine dollars per share, totalling $1,017,000 on common stock payable to stockholders of record on October 1, 1949. (2) The Board authorized redemption of the 13,205 shares of ten dollar par value preferred stock of Baker, Inc., callable at par. (3) The Board authorized a mortgage loan of $2,500,000 to be placed with American National, and authorized payment of the $1,500,000 first mortgage indebtedness to the Equitable. The proceeds of the loan were applied in payment of the nine dollar dividend, the redemption of the preferred stock, and payment of the old mortgage. Rupe Investment, as record owner on October 1, 1949, received a dividend of nine dollars per share, amounting to $972,090. At this point Baker, Inc., was finally in the financial shape Moody required for his purchase.

October 7, 1949, Rupe Investment deposited a check for $925,106.90 in its account at the Moody Bank. Texas National, the purchaser, issued its check for $2,227,923.10 to Rupe Investment.[3] This check was also deposited in Rupe's account at the Moody Bank. The two deposits totalled $3,153,030. A check for this amount was then drawn on the Moody account to pay the six notes given by Rupe Investment. The notes were cancelled and the stock was transferred. The difference to Rupe Investment at one dollar a share was $107,955. This was its commission.

All purchases of the Baker, Inc. stock were recorded on Rupe Investment's books and were carried as inventory securities. Federal and state stock transfer taxes were paid by Rupe Investment. The dividends were carried on Rupe Investment's books as income to it.[4]

## II.

 This Court, is well aware, as was the Tax Court, that a taxpayer "has the legal right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means of which the law permits". 30 T.C. 240. But the incidence of taxation depends upon the substance of a transaction. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981.

██ Rupe's record title will not of itself give rise to the beneficial ownership

3. The check for $2,227,923.10 which was issued by Texas National, payable to the taxpayer, was based upon the following computation submitted by the taxpayer to Texas National (R. 33):

| | | |
|---|---:|---:|
| Total purchases—107,955 shares | | $3,158,205.00 |
| Less: Annual dividend paid on 7/30/49 on 102, 526 shares | $ 66,641.90 | |
| Special dividend paid on 10/3/49 on 107,955 shares | 971,595.00 | |
| | | 1,038,236.90 |
| | | $2,119,968.10 |
| Plus profit of $1.00 per share on 107,955 shares | | 107,955.00 |
| Balance due from sale of stock | | $2,227,923.10 |

4. A summary of the transactions in Baker, Inc., stock for the entire fiscal year ended June 30, 1950, and the computation of the total amount paid by Texas National to the taxpayer is as follows (R. 34):

| | | |
|---|---:|---:|
| Baker Inc. stock acquired by the taxpayer— 108,961 shares (including the taxpayer's 250 shares at assumed cost of $30 per share) | | $3,174,236.15 |
| Dividends received: 102,526 shares at 65 cents per share | $ 66,641.90 | |
| 108,010 shares at $9 per share | 972,090.00 | |
| | | 1,038,731.90 |
| | | $2,135,504.25 |
| Plus amount received on 108,961 shares at $1.00 per share | | 108,961.00 |
| Paid by Texas National | | $2,244,465.25 |

from which it seeks to glean tax advantages. Title and beneficial ownership often are split. Mayer v. Donnelly, 5 Cir., 1957, 247 F.2d 322. And taxation is not so concerned with nice refinements of title as it is with actual command over property. Griffiths v. C. I. R., 308 U.S. 355, 357, 60 S.Ct. 277, 84 L.Ed. 319. Thus, stock dividend income is taxable to the one who beneficially enjoys the income, regardless of who is the payee or title owner of the stock. Northern Trust Co. v. United States, 7 Cir., 1952, 193 F.2d 127. The Northern Trust Company case makes it clear that a purchaser is the beneficial owner where the dividend is used to reduce the purchase price.[5] That is the case we have.

Rupe's naked title and risk assumed, such as it was, must be balanced against these indicia of beneficial ownership in another. (1) W. L. Moody & Co. supplied all the funds, in the form of notes interest-free if paid at or before maturity; no interest was paid. (2) Moody dictated the conditions of Rupe's stock purchase. (3) In terms of money in *his* pocket, Rupe received a dollar a share for each share of common stock, like any broker selling stock over the counter; and, significantly, Rupe received *nothing* for the preferred stock. (4) Rupe was protected against risk of loss and was not entitled to any enhancement in the value of the stock. (5) Rupe could not sell the stock, except to Texas National, nor could Baker, Inc. sell the hotel or any of its properties. (6) Rupe agreed that the corporation would make a new mortgage with American National Insurance, prepay the Equitable mortgage, and use the excess received from American National to reduce the earned surplus by payment of a dividend to the stockholder. All of this was for the benefit of Moody or his enterprises and it had the effect of reducing the investment to $2,500,000, as Moody required. (7) There was no loss in fact to Rupe, since the payments of dividends to Rupe offset the difference between the price Rupe paid for the stock and the price paid by Texas National. (8) The taxpayer had to account to Texas National for the 65 cents regular dividend declared June 8, 1949, payable to stockholders of record as of July 25, 1949. This was used by the taxpayer to reduce the ultimate cost of the stock to Texas National.

The Tax Court could not escape the conclusion that the taxpayer had no control over the dividends or over the stock; beneficial ownership was in Texas National. This Court cannot reach any other conclusion, either. Rupe was a broker, a middleman, the conduit between the former owners of Baker, Inc. and the new owner. There is no substance to the taxpayer's claim to a credit for the dividends and no substance to the claim that the taxpayer suffered a loss of $927,430.-28 on the sale of the stock.

The judgment is

Affirmed.

---

5. "[I]t follows clearly, we think, that the purchaser, who was the beneficial owner of the stock, received the full benefit of the dividend; that he alone was entitled to receive it, as the beneficial owner, and that he realized income in its receipt and disposition by application upon what he still owed for the stock." Northern Trust Co. of Chicago v. United States, 1951, 7 Cir., 193 F.2d 127, 131.