H. H. ROBERTSON COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 10386. Promulgated June 30, 1947.

*W. C. Magathan, Esq.*, and *R. K. Conrad, C. P. A.*, for the petitioner.
*Stanley L. Drexler, Esq.*, for the respondent.

MURDOCK, *Judge*: The Commissioner determined deficiencies as follows:

| | |
|---|---|
| 1939, income tax | $337. 63 |
| 1939, declared value excess profits tax | 95. 41 |
| 1940, declared value excess profits tax | 76, 740. 61 |
| 1940, excess profits tax | 171, 259. 90 |

The parties have settled several of their differences and the only issue for decision is, What is the amount of a credit against excess profits tax for 1940 to which the petitioner is entitled under sections 131 and 729 of the Internal Revenue Code for foreign tax (British income and excess profits tax) paid or accrued? The parties have presented the facts in a stipulation, which is adopted as the findings of fact. The question appears to be one without precedent.

Sections 131 and 729 provide that the excess profits tax imposed by subchapter E upon a domestic corporation shall be credited with the amount of any income and excess profits taxes, subject to certain limitations, paid or accrued during the taxable year to any foreign country in excess of the credit allowed for the same tax against the income tax imposed by chapter I. Section 131 (c) provides that, "if accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Commissioner, who shall redetermine the amount of the tax for the year or years affected," and a proper adjustment shall be made.

The petitioner is a domestic corporation. Its return for 1940 was filed with the collector of internal revenue for the twenty-third district of Pennsylvania. It used an accrual method of accounting and elected to take the credit for foreign taxes in the year of accrual.

The petitioner manufactures, sells, and erects building material products in this country and through a branch in Great Britain. Its net income from sources within Great Britain for 1940, for the purpose of computing the tax imposed by subchapter E, was $1,482,232.68. It accrued and paid, without consideration of refunds, the following British income and excess profits taxes [1] for 1940 on the $1,482,232.68:

| | |
|---|---|
| Income tax | $392, 774. 97 |
| Excess profits tax at 60% rate | 122, 810. 06 |
| Excess profits tax at 100% rate | 596, 441. 60 |
| Total | 1, 112, 026. 63 |

An excess profits tax of 100 per cent was imposed under the British law on all profits in excess of "standard profits" for each year or fraction thereof, beginning with April 1, 1940, and ending, in the case of this taxpayer, with December 31, 1945. The law provided that if the

---

[1] Dollar equivalents of British monetary figures are used throughout.

profits for any year were less than standard profits, then the deficiency of profits should be deemed to reduce "the aggregate amount" of the excess profits for the previous accounting periods and the amount of excess profits tax payable in respect to those excess profits is deemed to be reduced, and where the amount of the deficiency in standard profits exceeds the aggregate amount of the excess profits for previous accounting periods, the balance is used to reduce any excess profits for the next subsequent accounting period and then for the next period, and so on, until the deficiency is absorbed. Reducing the excess profits for any period reduced the tax in a like amount, since the tax was at the rate of 100 per cent. Repayments carried no interest. The British law allowed the amount of excess profits taxes for any year to be deducted as an expense in computing the income taxes for that year. If a refund of those taxes was made, then the deduction allowed for income tax purposes would be greater than the ultimate excess profits tax paid for that year. The British law took care of that situation by providing that, where "relief is given by way of repayment" of excess profits taxes collected for a year previous to that in which a deficiency in standard profits occurs, the deduction allowed for income tax purposes for the prior year shall not be altered, "but the amount repayable shall be taken into account in computing the profits and gains of the trade or business for the purpose of income tax as if it were a profit of the trade or business accruing in the chargeable accounting period in which the deficiency occurs."

The petitioner accrued and paid British excess profits tax at the 100 per cent rate for 1941 and 1943. It paid no excess profits taxes for 1942, 1944, and 1945, but, instead, sustained deficiencies in "standard profits" for those years. The following table shows the refunds of 100 per cent British excess profits tax paid in prior years, the income tax charged on the refunds, and the net amount refunded as a result of the deficiencies in standard profits for the three years just mentioned:

| | Amount of 100% British excess profits tax refunded | British income tax paid on refund | Net amount refunded |
|---|---|---|---|
| 1942 | $58,894.86 | $29,447.43 | $29,447.43 |
| 1944 | 362,173.53 | 181,086.77 | 181,086.77 |
| 1945* | 434,382.44 | 195,472.10 | 238,910.34 |
| Total | 855,450.83 | | 449,444.54 |

*No official determination or refund has been made for 1945, but the amounts shown have been accrued.

The British law, rules, and regulations do not designate the specific prior year or years to which refunds resulting from deficiencies in standard profits for any year relate. The Commissioner allocated the gross refund resulting from the 1942 deficiency to 1940 and 1941 in the proportion which the excess profits tax paid for each year bore

to the total paid for both years. He allocated the gross refund due to the 1944 deficiency to the years 1940, 1941, and 1943 in the proportion which the remaining unrefunded excess profits taxes paid for those years bore to the total of those amounts, and he allocated the gross refund due to the 1945 deficiency to those three years in a similar manner. The following table shows the total amount of the three refunds allocated to each of the three excess profits years:

| | |
|---|---|
| 1940 | $457, 923. 48 |
| 1941 | 373, 160. 70 |
| 1943 | 24, 366. 65 |
| Total | 855, 450. 83 |

He thus reduced the British excess profits tax originally paid and accrued for 1940 by the refunds and held that the credit for 1940 is based upon British income and excess profits tax paid and accrued in the amount of $654,103.15, i. e., $1,112,026.63, the total tax accrued in 1940, less $457,923.48, the portion of the total gross refund allocated to 1940.

The petitioner makes two contentions. The first is that the refunds should be used first to reduce the 1940 accrual and should then be applied to reduce the taxes of subsequent years in chronological order on a first-paid, first-refunded basis, and the second is that only the net refund, after the deduction of income taxes thereon, should be used to reduce the taxes accrued and paid in excess profits tax years. It thus reduces the 1940 accrual by a net refund of $306,989.47, consisting of the entire amount of the net refunds resulting from the 1942 and 1944 deficiencies in standard profits and $96,455.27 representing the refund attributable to that part of the 1945 deficiency, which, with the other deficiencies, equals the entire amount of the excess profits for 1940 subject to the 100 per cent tax. $1,112,026.63, the total tax originally accrued and paid for 1940, reduced by $306,989.47, would leave $805,037.16 as the basis for the credit for 1940 on account of foreign tax. The petitioner's argument, that the refunds should be applied first against 1940 accruals, tends to decrease the credit and increase the tax for 1940. Apparently, the petitioner is anticipating that this method, if adopted, would benefit the petitioner to a greater extent by giving it larger credits in later years when United States taxes are at higher rates.

The refunds here involved were not greater than the 100 per cent excess profits taxes paid in prior years and the question of allocating any part to a subsequent year does not arise. The parties have stipulated that the British law does not designate how a refund due to a deficiency in standard profits for any given year shall be allocated as between two or more prior years for which excess profits tax at the 100 per cent rate was accrued and paid. The Commissioner has no

regulation covering such a situation. Some method of allocating those refunds must be devised in order to compute the credit for foreign taxes under sections 131 and 729. The Commissioner has devised such a method, at least for the purpose of this case. He contends that he has followed the provisions of the British law wherever that law sheds any light on the problem and has not gone contrary to the provisions or spirit of that law in any respect. He might have offset the deficiency against the top of the pile of excessive profits (compare our carry-back provisions) and thus regarded the refund as a refund of the tax most recently paid. Another possibility is the one advocated by the petitioner that the deficiency should be used to offset excessive profits at the bottom of the pile and thus to bring about a refund of the first excessive profits tax paid. One of those methods has about as much to recommend it as the other. The determination of the Commissioner to allocate the deficiency in standard profits ratably against the excessive profits of prior years seems a reasonable choice. It finds some support in the British law. That law, for example, provides that the amount of any deficiency in standard profits shall be deemed to reduce the profits chargeable with excess profits tax arising from the trade or business. In other words, it reduces the excess profits in the aggregate, without regard to years. A similar provision is that in granting relief "the aggregate amount of the profits so chargeable for the previous chargeable accounting periods shall be deemed to be reduced by the amount of the deficiency, and the amount of excess profits tax payable in respect thereof shall be deemed to be reduced accordingly."

The petitioner argues that its method will permit the earliest closing of the years in chronological order, whereas the Commissioner's method will keep all of the years open until all questions of British excess profits taxes are finally determined. However, Congress provided for just such a contingency in section 131(c). It would probably be desirable to close the years chronologically, but there is nothing in the British law or in our law which impels this argument of the petitioner. Furthermore, it is not apparent that the method contended for by the petitioner would bring about any fairer or more desirable result between the Commissioner and taxpayers generally than does the method adopted by the Commissioner. The petitioner complains that the Commissioner "has forced the petitioner to litigate a very complicated and technical question which inevitably must be a 'battle of words.'" The fact of the matter is that there is little more to guide one in the solution of this problem than the two excerpts from the British law just mentioned. Here, no good reason for rejecting the method which the Commissioner has adopted appears, but, on the contrary, some support for that choice exists.

The petitioner states that the purpose of the credit for foreign tax was to support foreign trade and to prevent double taxation of the income from foreign sources by having no American tax apply against income from foreign sources unless the foreign tax rate was less than the American tax rate on that income. It attempts to demonstrate that those purposes will be fully accomplished by the method of allocation which it suggests, but double taxation will result from the method which the Commissioner has used. It does not appear, however, that this argument finds any support in a comparison of the two methods of allocating refunds. The method of allocation used by the Commissioner is approved.

The second contention of the petitioner is that the amounts of the refunds. of British excess profits taxes which should be used under section 131 (c) to reduce the British excess profits taxes originally accrued and paid are the net amounts of the refunds after the deduction of the income tax charged on the gross amount. One of its arguments in support of this contention is that the method used by the respondent produces an anomaly and throws the foreign tax credit completely out of relation to the foreign income taxed in the United States return. If the British income tax for 1940 had been adjusted by disallowing that part of the deduction for British excess profits tax represented by the refund applicable to 1940, then the 1940 credit for foreign taxes would have reflected a corresponding increase in British income taxes at the same time that it was decreased by the refund of British excess profits taxes. An equal credit would result from the use of the net refund as urged by the petitioner. The petitioner finds in this a nice relationship between the credit and the income from sources within Great Britian. This relationship, it says, is lost if the gross refund of British excess profits tax is used alone in making the adjustment in the credit for foreign tax required by 131(c).

The British law contains an express provision directly opposed to the result which the petitioner thus seeks. The amount of the excess profits tax payable in any year is allowed to be deducted as an expense incurred in that period for the purpose of computing the income tax by the British law, "Provided that where, under the provisions of this Act relating to deficiencies of profits, relief is given by way of repayment from excess profits tax chargeable for any chargeable accounting period previous to that in which the deficiency occurs, the amount of the deduction allowed under this section shall not be altered but the amount repayable shall be taken into account in computing the profits and gains of the trade or business for the purpose of income tax as if it were a profit of the trade or business accruing in the chargeable accounting period in which the deficiency occurs." Furthermore, the argument loses force if the income tax on the refund was a real tax of the deficiency year.

The petitioner argues that the British system of refunds of excess profits taxes is a relief provision which must be considered in its entirety; the provision for automatically reducing the gross refund by an income tax of 50 per cent is merely a method adopted for measuring the amount of relief which is the actual amount repaid; and the system, when seen as an integral plan, is simply one for refunding that net amount and is not a system involving the combination of refunding a larger amount and at the same time collecting a tax thereon. Both parties seem to believe that in every instance British income tax of 50 per cent will be charged against the refund of excess profits tax in the year of the deficiency in standard profits. This is of importance in the petitioner's argument just outlined, and also in its argument discussed in the preceding paragraph, since those arguments seem to derive some force from the supposition that the British collector would receive ultimately the same net amount whether he collected under the law as written or whether the law had provided for altering the deduction taken for excess profits taxes in computing income taxes for the excess profits year. The British law provides that the previous deduction shall not be altered, "but the amount repayable shall be taken into account in computing the profits and gain of the trade or business for the purpose of income tax as if it were a profit of the trade or business accruing in the chargeable accounting period in which the deficiency occurs." Another provision is that any loss sustained shall be added to the amount of the standard profits in determining the deficiency for that year. It would seem to be possible under these provisions for at least a part of the refund of excess profits tax to escape the 50 per cent income tax as, for example, where a loss had been sustained in the trade or business in the deficiency year. Incidentally, the stipulation shows that the income tax accrued for 1945 on the expected refund of excess profits tax for that year is less than 50 per cent. These possibilities tend to show that the refund and the tax thereon are separate and also that the nice relationship seen by the petitioner may be impossible of attainment in some cases.

This possible difference in the amount of the British income tax on the repayment also tends to refute the petitioner's statement that the refund of excess profits taxes is not in truth income of the deficiency year because it is not called income by the British law, but is merely required to be taken into account "as if it were a profit" of the deficiency year. A refund made for a later deficiency year certainly would not be a profit of the excess profits year 1940 and does not affect income of that year. The petitioner cites no authority for the proposition that it was not income for the deficiency year in which it was subjected to tax.

A further obstacle to the petitioner's contention that the taxing of the refund was only a part of an integral system of determining a net

refund is found in the arrangement of the provisions of the British law. The provisions for repayment of excess profits taxes are found in one section of the act, whereas those imposing income tax upon the refund are found in another independent and separate section under a different number. Thus, both the arrangement and wording of the British act tend to refute the petitioner's argument and to support the Commissioner's contention that two things have occurred: First, a repayment or refund of excess profits taxes for an excess profits tax year, and, second, the collection of income tax on that refund as a part of the tax of the year of the deficiency in standard profits. No explanation has been given by either party as to why the British law was written as it was. But there is no reason to assume that the British legislators had no purpose in what they did. The Commissioner has held that there were refunds of British excess profits taxes of 1940 within the meaning of section 131 (c) in the total amount of $457,-923.48. No compelling reason appears for holding that his action does not bring about a proper application of sections 131 and 729.

The petitioner makes frequent reference to double tax which it says will result from the application of the Commissioner's method. It seems to think double tax will result, for example, from using the gross excess profits refund to reduce the foreign credit under section 131 (c) without regard to the British income tax on that refund, which would thus appear to be a tax of the deficiency year. Where the Commissioner has based his credit upon the total tax paid to the foreign government on the foreign income for the taxable year in question, no double tax can be developed through an argument that he might have allowed a larger credit on some other theory. The petitioner also brings up the point that the Commissioner will probably not allow the income tax charged in the deficiency year on the refund as a part of the credit for foreign tax of that deficiency year. But that is not a question which needs to be decided in this proceeding, since the income resulting from the refund was not income from foreign sources for 1940, subject to the United States excess profits tax, and the British income tax thereon was not a tax of 1940.

The petitioner also argues that the gross refunds of excess profits taxes used by the Commissioner were not "refunded" within the meaning of that word as used in section 131 (c). They are called repayments in the British law, and no reason appears for holding that they are not taxes refunded within the meaning of section 131 (c). Incidentally, the parties themselves have referred to these amounts in their stipulation as refunds. The action of the Commissioner in regard to the only issue submitted for decision is sustained.

*Decision will be entered under Rule 50.*