THE STEEL IMPROVEMENT AND FORGE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77738. Filed May 15, 1961.

*Brooks W. Maccracken, Esq.*, for the petitioner.
*William O. Allen, Esq.*, for the respondent.

OPINION.

SCOTT, *Judge:* Respondent has determined a deficiency in the income tax of petitioner for the fiscal year ended September 30, 1954, in the amount of $33,368.19.

The issues remaining for our decision are: Whether the amount received by petitioner, nominally as a "dividend," from its wholly owned subsidiary was in legal effect a dividend, or a part of the purchase price paid to petitioner for the sale of its stock, and if a dividend, whether petitioner is entitled to a credit for foreign taxes deemed to have been paid because of the payment of income taxes to Canada by its subsidiary with respect to the accumulated profits from which the dividend was paid.

All of the facts have been stipulated and are so found.

Petitioner is a corporation organized under the laws of the State of Ohio. Its Federal income tax return for the fiscal year ended September 30, 1954, was filed with the district director of internal revenue at Cleveland, Ohio. Canadian Steel Improvement Limited (hereinafter called Canadian Steel) was incorporated under the laws of the Dominion of Canada by letters patent dated January 12, 1951. Petitioner was the owner of all of Canadian Steel's capital stock from January 30, 1951, until the stock was sold in 1954 to High Duty Alloys (Canada) Limited, a Canadian corporation (hereinafter called High Duty) which has never had any affiliation with the petitioner. Prior to the sale by petitioner of the stock of Canadian Steel the taxable year of that corporation began on October 1 and ended on September 30 in each year.

During the calendar years 1951, 1952, and 1953 and the first 4 months of 1954, Canadian Steel was constructing or operating, under agreement with His Majesty the King in Right of Canada, a new Crown-owned forge plant in Etobicoke, Ontario, and after the opening of that plant in February 1952, engaged in the business of manufacturing and selling forgings primarily for engines for the Royal Canadian Air Force.

Canadian Steel had no income and no loss prior to October 1, 1951. For its 2 fiscal years thereafter Canadian Steel had taxable income and was assessed and paid Canadian income taxes as follows, each figure being in Canadian funds:

| Year ended Sept. 30— | Taxable income | Income taxes assessed and paid | Date of final payment |
|---|---|---|---|
| 1952 | $31,136.11 | $12,674.79 | Mar. 27, 1953 |
| 1953 | 185,584.83 | 87,245.65 | Mar. 16, 1954 |

At the end of its taxable year, September 30, 1953, Canadian Steel had, for Canadian income tax purposes, undistributed income on hand in the amount of $116,800.50 [1] which amount remained available for the payment of dividends on April 15, 1954.

[1] Unless otherwise noted, all dollar amounts stated herein are in terms of Canadian dollars. The prevailing exchange rate at the time of the distribution hereinafter discussed was 101.4965052 United States dollars for 100 Canadian dollars.

During March and the first days of April 1954, representatives of petitioner, of High Duty, and of Hawker Siddley Group Limited, an English company (hereinafter called Hawker Siddley) with which High Duty was affiliated, had negotiations with one another in Toronto, Ontario, concerning the purchase and sale of the business and assets or stock of Canadian Steel. In the course of those negotiations the representatives of High Duty and Hawker Siddley were furnished with a copy of Canadian Steel's unaudited balance sheet and profit and loss account as of February 28, 1954. The profit and loss statement for the 5-month period ended February 28, 1954, which was furnished by petitioner to High Duty and Hawker Siddley showed net profit for the period of $65,677.56 which amount was arrived at after a deduction in the amount of $58,363.39 as provision for income taxes. The statements furnished by petitioner were interim statements only and did not reflect yearend adjustments; but on the basis of these statements the negotiators concluded that Canadian Steel's undistributed income on hand at the end of its preceding fiscal year, September 30, 1953, was approximately $116,000, and that its net income for the current year as of February 28, 1954, after the allowance for taxes was approximately $64,000, but that it did not have sufficient available cash to make a distribution of either amount to its stockholder, the petitioner.

In the course of the negotiations petitioner indicated that it would sell its stock in Canadian Steel if it could realize $900,000, and Hawker Siddley indicated that it would make this $900,000 available to petitioner if High Duty were sold all of the stock of Canadian Steel and if Canadian Steel's undistributed income on hand on September 30, 1953, were distributed before the transfer of the stock so that subsequent distributions from Canadian Steel to High Duty would not be made out of "designated surplus" within the meaning of section 28 of the Canadian Income Tax Act. On April 3, 1954, Hawker Siddley mailed to petitioner a letter offer, the material parts of which were as follows:

The Steel Improvement and Forge Company,            *April 3, 1954.*
*970 East Sixty-fourth Street,*
*Cleveland, Ohio.*

Dear Sirs:

We hereby offer to cause High Duty Alloys (Canada) Limited (hereinafter called the "Purchaser") to purchase from you all the issued and outstanding shares in the capital stock of Canadian Steel Improvement Limited, a Dominion company operating a Crown-owned plant in Etobicoke, Ontario (hereinafter called the "Company") for the price of $570,000 (Canadian funds) payable in cash on the date of closing—all on and subject to the following terms and conditions:

1. You warrant

(a) that since February 28th, 1954, the Company has not entered into and that it will not prior to the date of closing enter into any transaction other

than in the ordinary course of business, and that it has not made and will not prior to the date of closing make any payments or distributions (whether by way of dividends or otherwise) other than in the ordinary course of business; provided, however, that the Company may repay the loan in the amount of $150,000 owing to you and may also declare a dividend in a total amount not exceeding $180,000 payable (less Canadian withholding tax) prior to the date of closing;

*     *     *     *     *     *     *

2. In the event that the dividend referred to in paragraph 1 hereof is less than $180,000 then the price payable for the shares being purchased hereunder shall be increased by an amount equal to the difference between the amount of the said dividend and $180,000 provided that such increase shall in no event exceed $64,000.

3. The Agreement resulting from acceptance of this offer will, at the Purchaser's option, be null and void if

(a) prior to the date of closing the Company's solicitors * * * shall not have delivered to the Purchaser's solicitors * * * a report that, in their opinion, the Company has good title to its lands * * *, and that the Company conveyed a good title to the Crown in and to the lands upon which the Crown-owned plant operated by the Company is located, the whole subject to such title qualifications as, in the opinion of the Company's solicitors and the Purchaser's solicitors, are not material; or

(b) prior to the date of closing the Purchaser's auditors, Messrs. Price, Waterhouse & Co., shall have reported that, in their opinion, the unaudited balance sheet of the Company as at February 28th, 1954, which has been heretofore furnished by the Company to the Purchaser does not fairly show the financial position of the Company as at that date.

*     *     *     *     *     *     *

5. Closing will take place at the offices of the Company in Etobicoke on a date to be agreed upon, such date not to be later than 30th April, 1954.

*     *     *     *     *     *     *

Yours very truly,

HAWKER SIDDLEY GROUP LIMITED,
by /s/ R. H. Dobson.

On April 6, 1954, at Cleveland, Ohio, petitioner's president endorsed thereon petitioner's acceptance of the offer and returned it to Hawker Siddley, with a letter, the pertinent parts of which are as follows:

*April 6, 1954.*

Hawker Siddley Group Limited,
% Tory, Miller, Thompson, etc.,
*50 King Street, West*
*Toronto, Ontario, Canada.*

Attention: Sir Roy Dobson

My dear Sir Roy:—

This will acknowledge receipt of your letter of April 3, 1954 offering to cause High Duty Alloys (Canada) Limited to purchase from this Company all of the issued and outstanding shares of the capital stock in Canadian Steel Improvement Limited.

I am pleased to return herewith a copy of your Offer in which I have indicated my acceptance on Page 3.

I have been informed that the Hawker Siddley Group has made arrangements with the Canadian Bank of Commerce which will permit Canadian Steel Improvement Limited to repay to this Company the $150,000.00 now owing to us,

and a dividend not to exceed $180,000.00 prior to the date of closing. My acceptance of your Offer is conditioned on this assurance.

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

Sincerely yours,

THE STEEL IMPROVEMENT & FORGE CO.
/s/ C. H. Smith, Jr.,
*President.*

The arrangements referred to in petitioner's letter of April 6, 1954, with the Canadian Bank of Commerce were made by Hawker Siddley. On April 6, 1954, the Canadian Bank of Commerce so notified petitioner and Canadian Steel by a letter which was delivered to petitioner's Canadian solicitors and which was, in part, as follows:

*6th April, 1954.*

The Steel Improvement & Forge Company,
*Cleveland, Ohio,*
Canadian Steel Improvement Limited,
*Toronto, Ontario.*

Dear Sirs:

We understand that negotiations are under way for the sale by The Steel Improvement & Forge Company of the capital stock of its subsidiary, Canadian Steel Improvement Limited, to High Duty Alloys (Canada) Ltd. In this connection, we wish to advise that in the event of the sale taking place arrangements have been made with the Bank for the payment on presentation at this office of two cheques to be issued to The Steel Improvement & Forge Company in amounts of approximately $150,000 and $180,000 respectively.

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

Yours very truly,

/s/ M. A. Munro
M. A. MUNRO,
*Assistant Manager.*

On April 7, 1954, petitioner wrote the bank as follows:

*April 7, 1954.*

The Manager,
The Canadian Bank of Commerce,
*Toronto 1, Ontario.*
*Attention:* Mr. M. A. Munro,
*Assistant Manager.*

Dear Sirs:

Your letter of 6th April, 1954, addressed to The Steel Improvement and Forge Company and Canadian Steel Improvement Limited, has been delivered to us &ast; &ast; &ast;. We are pleased to say that, in reliance upon the assurances contained in your letter, The Steel Improvement and Forge Company has accepted an offer for the sale of the capital stock of Canadian Steel Improvement Limited, and it is expected that this sale will be consummated and the checks referred to in your letter presented some time next week.

&ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

Very truly yours,

THE STEEL IMPROVEMENT & FORGE COMPANY,
CANADIAN STEEL IMPROVEMENT LIMITED.
By /s/ Brooks W. Maccracken,
*Secretary.*

On April 15, 1954, petitioner received a letter dated April 14, 1954, from the auditors of the purchaser advising petitioner that they were satisfied with the accuracy of the balance sheet of Canadian Steel furnished to the purchaser. On April 13, 1954, Canadian Steel's solicitors advised petitioner that they were in a position to give High Duty's solicitors the title opinion referred to in Hawker Siddley's offer of April 3, 1954, and subsequently, on or before April 21, 1954, delivered a letter to High Duty's solicitors stating the opinion that Canadian Steel was the owner in fee simple and had a good and marketable title, free from all encumbrances except liens for current taxes not yet due, to the properties conveyed by Canadian Steel to His Majesty the King in Right of Canada at the time of such conveyance; and were further of the opinion that Canadian Steel at the present time was the owner in fee simple of certain other properties described in a schedule attached to the opinion.

On April 15, 1954, a meeting of Canadian Steel's board of directors was held in Cleveland, Ohio, at which six of the seven directors were present. Five of the seven men who were directors of Canadian Steel were also officers or directors of petitioner. No representative of High Duty or Hawker Siddley was present at the directors meeting of April 15, 1954, but pursuant to a previous understanding one of Canadian Steel's directors (who was also a director of petitioner) resigned and a representative of Hawker Siddley was elected to his position. At this meeting on April 15, 1954, it was resolved to repay petitioner its loans totaling $150,000, and a dividend of $11.60 per share was declared payable to the stockholders of record at the close of business on April 14, 1954. The minutes of the directors meeting of April 15, 1954, were prepared by the secretary of Canadian Steel without consultation with High Duty or Hawker Siddley and were not initialed or countersigned by either of them, but were examined by the Toronto solicitors of these two companies prior to April 21, 1954.

On April 20, 1954, pursuant to the resolution contained in the minutes of the meeting of April 15, Canadian Steel paid petitioner $116,000 less $5,800, the 5-percent Canadian tax withheld thereon. At about the same time Canadian Steel also paid petitioner $150,000 in repayment of loans theretofore made to it by petitioner. On April 21, 1954, petitioner delivered its stock certificates for all the outstanding capital stock of Canadian Steel to High Duty and received the latter's check for $634,000.

After April 21, 1954, petitioner had no further control, direct or indirect, of Canadian Steel. During the period between February 28, 1954, and the delivery of the stock on April 21, 1954, petitioner remained in control of the operations and affairs of Canadian Steel, subject only, however, after April 6, 1954, to the terms and conditions

of Hawker Siddley's offer of April 3, 1954, accepted by petitioner. From February 28, 1954, until after April 21, 1954, there were no changes in the board of directors or in the officers of Canadian Steel, other than the change heretofore noted as having been made on April 15, 1954.

From the time of its incorporation until after April 21, 1954, Canadian Steel never declared or paid any dividend on its capital stock except for the payment on April 20, 1954, in accordance with the resolution made at the meeting of the board of directors on April 15, 1954.

About December 1953, Canadian Steel had made an offer to the Deputy Minister of Defense Production to purchase for $707,000, on terms, a part of the forge plant owned by the Crown and operated by petitioner, but this offer had been refused. During the negotiations for the sale by petitioner of its stock to High Duty, petitioner was aware of the possibility that Canadian Steel, under the control of Hawker Siddley or High Duty, might purchase the forge plant from the Crown and apply for a "Special Depreciation Certificate" thereon, with the possible result of a loss for its current taxable year and a possible loss carryback to the year ended September 30, 1953.

After April 20, 1954, when petitioner no longer had any control of Canadian Steel, it was not consulted about Canadian Steel's subsequent activities in the acquisition of property or the handling of its financial accounts or the preparation of its income tax returns, and its subsequent financial statements and tax returns were kept confidential from petitioner until after petitioner had filed its petition in this case.

Canadian Steel's profit and loss account for the 7-month period ended April 30, 1954, showed net profits for that period of $94,238.11, after deduction of an amount of $83,908.50 provision for income tax. This statement was an interim statement only and did not reflect yearend adjustments. As of May 1, 1954, Canadian Steel purchased from the Crown the forge plant which it had theretofore constructed and operated under agreement with the Crown. After that purchase Canadian Steel applied for and was granted by the Minister of Defense Production for Canada a Special Depreciation Certificate which permitted it to claim for Canadian income tax purposes an additional allowance in respect of the capital cost of that purchase.

After April 21, 1954, Canadian Steel changed its fiscal year to begin on August 1 and end on July 31. On or about January 30, 1955, it filed its Canadian corporation income tax return for its 10-month fiscal period which began October 1, 1953, and ended July 31, 1954. In its return for that period, it reported a taxable loss of $365,708.29 and a net profit per its annual accounts for the same

period of $115,104.70 on net sales of $3,203,121.10. This return contained a schedule reconciling these profits and losses as follows:

| | | |
|---|---:|---:|
| Net profit per annual accounts | | $115,104.70 |
| Add: | | |
| Taxes on income | $112,720.32 | |
| Donations | 3,470.00 | |
| Legal and other nonallowable expenses | 2,281.15 | |
| | | 118,471.47 |
| | | 233,576.17 |
| Deduct: | | |
| Capital cost allowance claimed | 682,024.16 | |
| Less—depreciation charged in accounts | 82,739.70 | |
| | | 599,284.46 |
| Loss for tax purposes for the period | | 365,708.29 |

Of the total amount of capital cost allowance claimed by Canadian Steel for the 10-month period, $491,128.98 was the additional allowance on account of the Special Depreciation Certificate granted to it as heretofore stated, and $190,895.18 was normal depreciation allowed by the Canadian Income Tax Regulations.

Pursuant to the Canadian Income Tax Act then in effect, Canadian Steel, on or about January 30, 1955, filed an amended corporation income tax return for the taxation year ended September 30, 1953, in which it claimed a deduction in the amount of $185,584.83 as a loss carryback from 1954 which deduction reduced its taxable income for the taxation year ended September 30, 1953, to zero and entitled it either to receive refund of the amount of income tax previously paid for that taxation year or to have the amount of its overpayment applied to other payments then or thereafter due from it under the Canadian Income Tax Act.

Canadian Steel's financial statement for the 10-month period ended July 31, 1954, showed as an asset item, "Taxes on income recoverable" in the amount of $127,245.65. This amount represented the amount of $87,245.65 paid as income tax to Canada for the taxation year ended September 30, 1953, plus the amount of $40,000 paid to the Canadian Government as income taxes in advance for the current taxation year. This statement showed a liability item of "Tax Reductions Earned, to be brought into income in future years" in the amount of $199,997.67. This amount represented the $87,245.65 paid for the taxation year ended September 30, 1953, plus an overprovision of $31.70 in its accounts for taxes for the taxation year ended September 30, 1952, and an estimated tax of $112,720.32 which would have been payable in respect of the fiscal period ended July 31, 1954, had Canadian Steel not claimed special depreciation for tax purposes.

Section 28 of the Canadian Income Tax Act provides that where a corporation, in a taxation year, received a dividend from a corpora-

tion that is a resident of Canada in the year, an amount equal to the dividend may be deducted from the income of that corporation for the year for the purpose of determining its taxable income, except that where a dividend is paid by a corporation that is a resident of Canada and is controlled by the receiving corporation and the payer had undistributed income on hand at the end of its last complete taxation year before the control was acquired (which undistributed income is referred to as "designated surplus") if the dividend is paid out of "designated surplus" no amount is deductible by the receiving corporation.

In petitioner's Federal income tax return for the year ended September 30, 1954, it reported the amount of $117,735.95 [2] as follows:

| | |
|---|---:|
| Income from dividends | $18, 737. 59 |
| Schedule D—Long-term gains | 98, 998. 36 |
| | 117, 735. 95 |

Petitioner's return was so prepared on the theory that Canadian Steel's earnings and profits for the years ended September 30, 1953, and July 31, 1954, had been eliminated by a loss carryback and that Canadian Steel had left as its only remaining earnings and profits those for the year ended September 30, 1952, in the amount of $18,737.59 (United States dollars).

Both parties agree that Canadian Steel paid a dividend, and that a dividend must be paid to and received by someone. *DeGuire* v. *Higgins*, 159 F. 2d 921 (C.A. 2, 1947), certiorari denied 331 U.S. 858 (1947).

Petitioner contends that the buyer and not the seller was the true recipient of the dividend since the disbursement was in substance a payment of part of the purchase price for the stock, or the buyer was beneficially in control of the stock at the time of the dividend. In support of its contention, petitioner relies on *William P. Aull, Jr., et al, Executors*, 26 B.T.A. 862 (1932); *Estate of Authur L. Hobson*, 17 T.C. 854 (1951); *Frithiof T. Christensen*, 33 T.C. 500 (1959); *Moore* v. *Commissioner*, 124 F. 2d 991 (C.A. 7, 1941), reversing 42 B.T.A. 949 (1940); *DeGuire* v. *Higgins, supra; Miller* v. *Commissioner*, 247 F. 2d 206 (C.A. 7, 1957), reversing 26 T.C. 151 (1956); and *Rupe Investment Corporation* v. *Commissioner*, 266 F. 2d 624 (C.A. 5, 1959), affirming 30 T.C. 240 (1958).

Respondent contends that the evidence clearly shows that it was the intention of the parties that the dividend be paid to petitioner; that the dividend was not a part of the purchase price since the contract of sale permitted but did not require that a dividend be paid to the extent of $180,000, but that adjustment to the purchase price would

[2] $116,000 United States dollars × the rate of exchange of 101.4965052.

be made only to the extent of $64,000 irrespective of whether petitioner had Canadian Steel declare a dividend to it of the remaining $116,000 or not; that petitioner was in control of the corporation at the time the dividend was declared; that no representative of the purchaser was present at the meeting at which the dividend was declared, and that the purchaser did not initial or countersign the minutes of that meeting; that the dividend was paid while petitioner was still owner of the stock; that both the purchaser and petitioner planned the transaction as a dividend to petitioner in substance as well as in form; and that petitioner, itself, considered the payment as a dividend to it at the time its income tax return was filed, relying on *Sam E. Wilson, Jr.*, 27 T.C. 976 (1957), affirmed per curiam 255 F. 2d 702 (C.A. 5, 1958).

We agree with respondent. The cases of *William P. Aull, Jr., et al., Executors, supra; Estate of Arthur L. Hobson, supra; Frithiof T. Christensen, supra; Moore* v. *Commissioner, supra;* and *DeGuire* v. *Higgins, supra,* all involve specific agreements for the use of the corporate payment to the prior stockholders for a part of the purchase price of the stock. In each of these cases, except *William P. Aull, Jr., et al., Executors, supra,* the sale of the stock had been completed and the stock was being held by the seller purely as security for the payment of the balance of the purchase price at the time the remaining portion of the purchase price was being paid by distributions from the corporation. In the *Aull* case, after an agreement as to the purchase price of the stock had been made, the seller desired to have a portion of the purchase price paid in the form of a dividend; a supplemental agreement was entered into between the parties whereby the purchaser agreed at the seller's request to pay a portion of the purchase price through the corporation rather than directly to the seller. These cases are all clearly distinguishable from the instant case wherein the agreed purchase price was not to be altered whether or not the dividend to the extent of $116,000 was paid. Here, if the petitioner were to receive the $116,000 at all, it was necessary for it to take the amount as a dividend. This arrangement was an integral part of the original contract of sale negotiated between the parties. It is clear that the purchaser was unwilling to pay for the accumulated earnings of Canadian Steel as of September 30, 1953, in the approximate amount of $116,000 and would only take them at no increased purchase price, leaving the petitioner no alternative, if it wished to consummate the sale, except to take the earnings to this extent as a dividend or forego entirely the receipt thereof. In the *Miller* case, prior to the payment of the dividend, the stock had been assigned to the purchasers and the dividend declared was formally approved by the purchasers by endorsement of the corporate minutes. In the view of the facts taken by the Circuit Court, the dividend was used to reduce the

purchase price specified in the contract. The *Rupe Investment Corporation* case involved a situation different factually from the instant case. In that case a broker who was agent for the purchaser, purchased the stock from the seller and had a dividend declared prior to transferring it to his principal. This Court, in the *Rupe Investment Corporation* case, determined that the broker was not the true owner of the stock but was holding it merely as agent for the purchaser. In the instant case, as in the *Sam E. Wilson, Jr.* case, the stock, at the time of the declaration of the dividend, was not in petitioner merely for the purpose of providing security for the payment of the purchase price but was actually owned by petitioner, the sale not having been completed. In fact, the facts in the instant case even more strongly support respondent's position that the dividend was that of petitioner than did the facts in the *Wilson* case. In the *Wilson* case the taxpayer might have accomplished the same overall result without the declaration of the dividend whereas in the instant case the taxpayer was required to either take the payment as a dividend or forego receipt of the amount at all. In the *Wilson* case, we stated, "We are governed by what was done, rather than what might have been done. Cf. *Merrill C. Gilmore*, 25 T.C. 1321 (1956)." In the instant case, it is clear that the purchaser was unwilling to buy the stock except with the understanding that the so-called "designated surplus" be taken by petitioner, if at all, as a dividend to it. The facts in the instant case are to some extent similar to those in *T. J. Coffey, Jr.*, 14 T.C. 1410 (1950). In *T. J. Coffey, Jr.*, *supra*, the purchasing corporation was unwilling to take assets of the seller because of doubt as to their value and, therefore, an agreement was arrived at whereby the sellers would declare these assets as a dividend prior to the consummation of the sale. In the *T. J. Coffey, Jr.* case, the purchasers agreed to assist in the carrying forward of this plan by holding petitioner harmless against claims of preferred stockholders or the bank because of the declaration of the dividend and endeavoring to obtain from the bank a release of liens insofar as they covered the assets to be declared as a dividend to the sellers. In holding the dividend to be that of the sellers, we stated:

The purchasers did not agree to buy their stock and then turn over to them $190,000 and the Cabot payment in consideration therefor. From the testimony above set forth it is apparent that they were not interested in the Cabot payment, did not want it included in the assets of the corporation at the time they acquired its stock, and negotiated with petitioners to acquire stock of a corporation whose assets did not include the unwanted Cabot payment.

Similarly, in the instant case, the purchasers did not want to purchase the "designated surplus" of Canadian Steel because of the provision of the Canadian tax law and negotiated with petitioner to purchase the stock of Canadian Steel after petitioner had removed from Canadian Steel the "designated surplus."

Petitioner, in the alternative, contends that if the $116,000 was taxable to petitioner as a dividend, petitioner was entitled to a foreign tax credit under section 131(f)(1) of the Internal Revenue Code of 1939 [3] on account of the $99,920.44 Canadian income taxes paid by Canadian Steel. It is petitioner's position that this $116,000 was by agreement between it and High Duty and under Canadian law paid out of the accumulated earnings of Canadian Steel as of October 1, 1953, and should be so considered under section 131(f)(1). Petitioner further contends that even though the taxes paid by Canadian Steel to Canada were refunded to that company, such refund should not be considered as taxes refunded under section 131(c) of the Internal Revenue Code of 1939,[4] since petitioner owned no stock interest in Canadian Steel when the loss which gave rise to the refund occurred or when the refund was allowed.

Respondent takes the position that in determining the character of dividends received by residents of the United States from foreign

---

[3] SEC. 131(f)(1). TREATMENT OF TAXES PAID BY FOREIGN CORPORATION.—For the purposes of this section, a domestic corporation which owns at least 10 per centum of the voting stock of a foreign corporation from which it receives dividends in any taxable year shall be deemed to have paid the same proportion of any income, war-profits, or excess-profits taxes paid or deemed to be paid by such foreign corporation to any foreign country or to any possession of the United States, upon or with respect to the accumulated profits of such foreign corporation from which such dividends were paid, which the amount of such dividends bears to the amount of such accumulated profits. The term "accumulated profits" when used in this subsection in reference to a foreign corporation, means the amount of its gains, profits, or income in excess of the income, war-profits, and excess-profits taxes imposed upon or with respect to such profits or income; and the Commissioner with the approval of the Secretary shall have full power to determine from the accumulated profits of what year or years such dividends were paid; treating dividends paid in the first sixty days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings. In the case of a foreign corporation, the income, war-profits, and excess-profits taxes of which are determined on the basis of an accounting period of less than one year, the word "year" as used in this subsection shall be construed to mean such accounting period.

[4] SEC. 131(c). ADJUSTMENTS ON PAYMENT OF ACCRUED TAXES.—If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Commissioner, who shall redetermine the amount of the tax for the year or years affected, and the amount of tax due upon such redetermination, if any, shall be paid by the taxpayer upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 322. In the case of such a tax accrued but not paid, the Commissioner as a condition precedent to the allowance of this credit may require the taxpayer to give a bond with sureties satisfactory to and to be approved by the Commissioner in such sum as the Commissioner may require, conditioned upon the payment by the taxpayer of any amount of tax found due upon any such redetermination; and the bond herein prescribed shall contain such further conditions as the Commissioner may require. In such redetermination by the Commissioner of the amount of tax due from the taxpayer for the year or years affected by a refund, the amount of the taxes refunded for which credit has been allowed under this section shall be reduced by the amount of any tax described in subsection (a) imposed by the foreign country or possession of the United States with respect to such refund; but no credit under this section, and no deduction under section 23, shall be allowed for any taxable year with respect to such tax imposed on the refund. No interest shall be assessed or collected on any amount of tax due upon any redetermination by the Commissioner, resulting from a refund to the taxpayer, for any period prior to the receipt of such refund except to the extent interest was paid by the foreign country or possession of the United States on such refund for such period.

corporations, the accumulated earnings and profits from which the dividends are paid are to be determined under American rather than foreign law and that under American law, the dividend here paid was out of accumulated earnings and profits of the 10-month period of Canadian Steel which began October 1, 1953, and ended July 31, 1954, with respect to which no income tax was paid by Canadian Steel to Canada. In the alternative, respondent contends that if all or any part of the dividend is to be considered as paid out of earnings accumulated as of the beginning of the fiscal period of Canadian Steel from October 1, 1953, to July 31, 1954, that under section 131(c) the taxes paid with respect to these accumulated earnings for the fiscal year ended September 30, 1953, of Canadian Steel should be deemed to have been refunded to petitioner. Respondent's premise that in determining the character of dividends received by residents of the United States from foreign corporations, the accumulated earnings and profits from which the dividends are paid are to be determined under American rather than foreign law is well taken. *Edward D. Untermyer*, 24 B.T.A. 906 (1931), affd. 59 F. 2d 1004 (C.A. 2, 1932), certiorari denied 287 U.S. 647 (1932). Cf. *Keasbey & Mattison Co.* v. *Rothensies*, 133 F. 2d 894 (C.A. 3, 1943), certiorari denied 320 U.S. 739 (1943); *National Carbon Co.*, 2 T.C. 57 (1943); and *Central Aguirre Sugar Co.*, 24 T.C. 630 (1955).

The loss of Canadian Steel for the year 1954 was occasioned by a capital allowance under Canadian law which obviously would not represent an allowable deduction under American law and petitioner does not now contend to the contrary.[5] Furthermore, as respondent contends, under the provisions of section 115(a) of the Internal Revenue Code of 1939,[6] a distribution made by a corporation is a

---

[5] Petitioner in its return considered all but $18,737.59 (American funds) of the 1954 dividends to be a return of capital on the theory that the accumulated profits of Canadian Steel were consumed by the loss arising for Canadian income tax purposes from the capital allowance.

[6] SEC. 115. DISTRIBUTIONS BY CORPORATION

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter (except in section 201(c)(5), section 204(c)(11) and section 207(a)(2) and (b)(3) (where this reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. In the case of a corporation which, under the law applicable to the taxable year in which the distribution is made, is a personal holding company, or which, for the taxable year in respect of which the distribution is made under section 504(c) or section 506 or a corresponding provision of a prior income-tax law, is a personal holding company under the law applicable to such taxable year, such term also means any distribution (whether or not a dividend as defined in the preceding sentence) to its shareholders, whether in money or in other property, to the extent of its subchapter A net income, less the sum of the following:

(1) The net operating loss credit provided in section 26(c)(1);
(2) The dividend carry-over provided in section 27(c); and
(3) The deduction for amounts for retirement of indebtedness provided in section 504(b).

dividend if it is out of its earnings and profits accumulated after February 28, 1913, or out of earnings or profits accumulated during the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of earnings or profits at the time the distribution was made. Section 115(b) provides that every distribution is to be considered to be made from most recently accumulated earnings and profits. For determining the taxability of the dividend this is a conclusive statutory presumption. *J. Barstow Smull*, 17 T.C. 1393, 1398 (1952), and cases therein cited.

We would, therefore, agree with respondent that if the question here were whether there existed accumulated earnings and profits available for payment of a dividend to petitioner, these precedents would support his contention that there were, for the fiscal period of Canadian Steel from October 1, 1953, through July 31, 1954, earnings and profits available out of which the dividend should be considered as paid. However, this is not dispositive of the question here present, for section 131(f) of the Internal Revenue Code of 1939 provides its own definition of accumulated earnings for the purpose of determining whether a domestic corporation which receives dividends from a foreign corporation in which it owns the requisite amount of stock is entitled to a credit for taxes deemed to have been paid. The term "accumulated profits" for the purposes of section 131(f) when used in reference to a foreign corporation means the amount of its gains, profits, or income in excess of the income, war profits, and excess profits taxes imposed upon or with respect to such profits or income; and "the Commissioner with the approval of the Secretary shall have full power to determine from the accumulated profits of what year or years such dividends were paid; treating dividends paid in the first sixty days of any year as having been paid from the accumulated profits of the preceding year or years (unless to his satisfaction shown otherwise), and in other respects treating dividends as having been paid from the most recently accumulated gains, profits, or earnings." Section 131(f), in providing that where the dividend is not paid within the first 60 days after the close of the foreign corporation's taxable year, the dividends shall be treated as having been paid from the most recently accumulated gains, profits, or earnings, does not provide, as does section 115(a), that the dividend shall be considered to be out of earnings or profits of "the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of earnings or profits at the time the distribution was made." Absent this provision in section 131(f) the normal definition of the most recently accumulated

gains, profits, or earnings would appear to require either a holding that the word "accumulated" refers to accumulated as of the beginning of the year as petitioner contends or "accumulated" refers to accumulated at the date of payment of the dividend as respondent contends as an alternative to his major contention that the dividend should be considered out of the full current year's profits. Since this same section of the 1939 Code provides that where the dividend is paid within 60 days from the close of the taxable year it shall be treated as having been paid from the accumulated profits of the preceding year or years, it logically follows that the reference to most recently accumulated gains, profits, or earnings in the following portion of the sentence is to be distinguished from the accumulated profits of the preceding year. In *F. H. Peavey & Co.* v. *United States*, 55 F. 2d 516 (Ct. Cl. 1932), it was held under section 238(e) of the Revenue Act of 1921 (which is in all material respects the same as section 131(f) of the Internal Revenue Code of 1939) that for the purpose of foreign tax credit, the dividend should be considered as having been paid out of the accumulated earnings and profits as of the beginning of the year in which it was paid absent any showing of the amount of the accumulated earnings and profits at the date the distribution was made. Prior to the amendment of what is now section 115(a) of the Internal Revenue Code of 1939, by the Revenue Act of 1936 to provide for the determination of earnings and profits for the current year without consideration of earnings and profits accumulated as of the date of the payment of the dividend, dividends were considered as paid out of accumulated earnings and profits as of the date of the distribution. *Dorothy Whitney Elmhirst*, 41 B.T.A. 348 (1940). Cf. *Mason* v. *Routzahn*, 275 U.S. 175 (1927), and *Edwards* v. *Douglas*, 269 U.S. 204 (1925), discussed therein. It appears to us that the proper interpretation of section 131(f) is that where the evidence is sufficient to show the amount of the accumulated earnings and profits as of the date of the distribution, and the distribution is more than 60 days after the close of the preceding taxable year of the foreign corporation, the distribution for the purpose of section 131(f) should be considered to be out of the accumulated earnings and profits as of the date of distribution.[7] Here, the profits of Canadian Steel for the period October 1, 1953, through February 28, 1954, were shown to be approximately $64,000. This amount was considered by the parties to be the accumulated earnings for the current year at the closing

---

[7] *National Carbon Co.*, 2 T.C. 57 (1943), and *Central Aguirre Sugar Co.*, 24 T.C. 630 (1955), did not involve the issue of ascertaining out of the earnings and profits of what years the dividend was paid, the issue there being whether under section 131(f) the dividends were from earnings and profits at all.

date of the sale of the stock, April 21, 1954. The profits as of April 30, 1954, were shown by the interim statement to be $93,440.15 but respondent does not contend that this greater amount which was taken from an unaudited statement represents the accumulated profits as of April 20, 1954. Petitioner does not contend that the profits for the current year of Canadian Steel up to April 20, 1954, were less than $64,000 but argues that under section 131(f) these do not constitute accumulated profits. For the purposes of section 131(f) of the Internal Revenue Code of 1939, the dividend paid to petitioner on April 20, 1954, to the extent of $64,000 Canadian funds is considered to be out of earnings and profits of the fiscal period October 1, 1953, through July 31, 1954, of Canadian Steel with respect to which profits no income tax was paid to Canada.

There remains the amount of $52,000 Canadian funds of the dividend paid on April 20, 1954, which for the purposes of section 131(f) must be considered to have been paid from accumulated earnings of the Canadian corporation for its fiscal year ended September 30, 1953. With respect to these accumulated earnings, a tax had been paid to Canada by the Canadian corporation and under section 131(f), since petitioner owned over 10 percent of the stock of Canadian Steel at the time of payment to it of the dividend from Canadian Steel, it would at the date this dividend was paid have been entitled to take on its United States income tax return a credit for taxes deemed to have been paid to Canada. However, subsequent to April of 1954 and at a time when petitioner no longer owned any stock in Canadian Steel the entire tax for the fiscal year 1953 paid to Canada by Canadian Steel was refunded to that corporation. Section 131(c) requires that an adjustment be made in the credit for foreign taxes allowed to a taxpayer "if any tax paid is refunded in whole or in part." We believe that this includes taxes deemed to have been paid by a domestic corporation as well as taxes actually paid directly by such a corporation to a foreign country. The very terminology "deemed to have been paid" would indicate that the domestic corporation is to be considered as having paid the tax to a foreign country. If petitioner had held stock in Canadian Steel at the time of the refund of the taxes to Canadian Steel as well as at the time of the payment of the taxes by Canadian Steel to Canada, petitioner admits that the refund made to Canadian Steel would have been deemed to have been received by it. Here, however, at the date of the refund petitioner had no interest in Canadian Steel, did not know the financial situation of Canadian Steel, and apparently was not even aware that Canadian Steel had received a refund of its income taxes for its fiscal year 1953 until after the petition in the instant case was filed and petitioner argues that under these circumstances it cannot be

deemed to have received a refund of the taxes deemed to have been paid by it to Canada. Neither party has cited to us a case dealing with a refund of taxes deemed to have been paid.

Petitioner relies upon our statement in *Texas Co. (Caribbean) Ltd.*, 12 T.C. 925 (1949), that—

The parties also recognize that only two general situations are covered by section 131(c) : (1) Where the amount of foreign tax when paid differs from the amount claimed as a credit; and (2) where the taxpayer receives a refund of foreign tax, which he previously claimed as a credit.

Petitioner and respondent both cite *Pacific Metals Corporation*, 1 T.C. 1028 (1943), dealing with the statute of limitations with respect to a deficiency occasioned by the refund of a previously claimed foreign tax credit and respondent relies on the following language therein:

The question raised by the pleadings is decided against the petitioner. Section 131(c) is a special provision and its terms are clear. It operates to postpone the time for the payment of the net balance of the domestic income tax for a particular year until the collector has made demand upon the taxpayer for payment of the balance of the domestic tax due after the taxpayer has ascertained the correct amount of the foreign tax and has notified the Commissioner of the correct amount. Reading (c) with (a) of section 131, the credit under (a) initially taken is a provisional or interim credit, subject to correction by the taxpayer himself.

Petitioner also cites *H. H. Robertson Co. v. Commissioner*, 176 F. 2d 704 (C.A. 3, 1949), affirming 8 T.C. 1333 (1947). It is clear in the *Texas Co.* case that this Court was not concerned with a question of whether the petitioner was the person who received the refund of the foreign taxes and that the paraphrasing of the language to "where the taxpayer receives a refund of foreign tax" was not a holding of when a taxpayer would be "deemed" to have received a refund.

The respondent, relying on his regulations, argues that a tax deemed to have been paid may also be deemed to have been refunded but he cites no reference to any provision therein of when a tax will be deemed to have been refunded.

Petitioner notes that the statute requires that the taxpayer notify the Commissioner with respect to a refund of the taxes and further notes that in the provisions with respect to interest, section 131(c) specifically refers to a tax due upon a redetermination resulting from a refund to the taxpayer. However, if a tax deemed to have been paid by a taxpayer is also deemed to have been refunded, the reference in the provision as to interest on a tax "resulting from a refund to the taxpayer" would not foreclose an inclusion of a tax resulting from a refund deemed to have been made to the taxpayer. The provision that the taxpayer notify the Commissioner of the refund, it seems to us, would presuppose that this be done when with reasonable diligence the taxpayer is able to learn of such refund. Cf. *Pacific Metals Corporation, supra.*

Viewing section 131 of the Internal Revenue Code of 1939 as a statute designed to excuse a taxpayer from payment of taxes to the extent that such amounts have been paid to and retained by a foreign country on the same income, cf. *H. H. Robertson Co.* v. *Commissioner, supra; Pacific Metals Corporation, supra;* and *American Chicle Co.* v. *United States,* 316 U.S. 450 (1942), we hold that petitioner is not entitled to a credit for taxes deemed to have been paid to Canada with respect to the $52,000 portion of the dividend paid from accumulated earnings of the fiscal year ended September 30, 1953, of Canadian Steel since all taxes paid by Canadian Steel to Canada for its fiscal year 1953 have been refunded.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

MULRONEY, *J.*, concurring: I concur in the result of the majority opinion. I think all that need be said to reach that result on the first issue is that the statutes (sec. 22(e) and sec. 115(a), I.R.C. 1939) make a dividend distribution to the sole stockholder taxable income, and it is not something other than a dividend distribution to such stockholder when it is made pursuant to, or under the provisions of, the stockholder's own contract with another party.

---

FORRESTER, *J.*, dissenting: I must dissent from the holding of the majority that the payment of the $116,000 here involved was a taxable dividend to seller. I believe it was a part of the purchase price to seller and therefore a dividend to buyer.

An analysis of the cases dealing with this problem, and they are cited by the majority, indicates to me that the disputed dividend is properly taxable to the party, be it seller or purchaser, who has the beneficial ownership of the stock when the right to the dividend becomes fixed. Otherwise stated, such dividend is properly taxable to the party who then bears the operating risks of the business and stands to benefit from profits or suffer detriment from losses.

In the instant case I think it clear that buyer was in this position on April 15, 1954, when the right to this $116,000 dividend became fixed; indeed, the parties have stipulated that at this time "the Petitioner [seller] remained in control of the operations and affairs of Canadian Steel, *subject only, however, after April 6, 1954, to the terms and conditions of Hawker Siddley's offer of April 3, 1954, accepted by the Petitioner."* (Emphasis supplied.) Petitioner's position then, was that of a trustee for purchaser, managing the property for purchaser's benefit.

I consider our holding in *Sam E. Wilson, Jr.*, 27 T.C. 976 (1957), affirmed per curiam 255 F. 2d 702 (C.A. 5, 1958), as direct support for my position in the instant case. There the sales price of petitioner's stock was fixed by the agreement at $4 million *less* net liabilities (excess of total liabilities over current assets) on the closing date which was in the future. The dividend payment in question (a cancellation of the seller-petitioner's indebtedness to the corporation) was made after the agreement date and prior to the closing date; thus it was tantamount to a payment to the party who had a substantial interest in the continued success of the business venture because earnings up to the closing date enhanced his selling price (by decreasing net liabilities). What we said in *Wilson* is equally pertinent here (pp. 982–983) :

The dividend [voluntary cancellation of stockholder's debt to the corporation] is "inexorably someone's income." *DeGuire* v. *Higgins*, 159 F. 2d 921, 923 (C.A. 2, 1947) ; *and that "someone" is the beneficial owner of the shares upon which the dividend was paid. Moore* v. *Commissioner*, 124 F. 2d 991 (C.A. 7, 1941). * * * [Emphasis supplied.]

I look upon the form of the transaction used by the parties, buyer and seller in the instant case, as relatively unimportant, for the true substance and effect of their agreement was that purchaser would pay so much for all of the assets, rights, and liabilities (except the $116,000 of designated surplus) represented by the stock of Canadian Steel, the agreement to be consummated by the transfer of such stock. It is less than realistic to suppose that the amount agreed to be paid as purchase price under this arrangement was not lessened because seller took the designated surplus or conversely, that purchaser would not have paid more if seller had not done so. Thus the disputed dividend in the instant case affected the quantum of the purchase price to be paid just as surely as did the voluntary cancellation of stockholder's debt to the corporation in *Sam E. Wilson, Jr.*, *supra*. True, the adjustment in the instant case was a prospective one made by the parties in anticipation of the designated surplus going to seller while the adjustment in *Wilson*, although probably anticipated by buyer and seller, was not actually effected until the stockholder's debt was voluntarily canceled, but this difference does not distinguish or alter the principle upon which I rely. In each case the purchase price is changed because of the later action.

Since I would hold that the $116,000 is taxable to petitioner as a part of the purchase price paid for the shares of Canadian Steel I would not reach the second and third points discussed by the majority. As to the third point however, I feel that the deemed-paid credit should be allowed under the facts of this case since petitioner had no interest in or control over Canadian Steel at the date of the refund and obtained no economic benefit therefrom.